NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LUMMUS INDUSTRIES, INC., Respondent.

No. 81–7447.

United States Court of Appeals, Eleventh Circuit.

June 25, 1982.

Rehearing Denied Aug. 25, 1982.

Elliott Moore, Deputy Asst. Gen. Counsel, Collis Suzanne Stocking, N. L. R. B., Washington, D. C., Jolane Findley, Mclean, Va., for petitioner.

Hatcher, Stubbs, Land, Hollis & Rothschild, James Humes, II, Columbus, Ga., for respondent.

Before INGRAHAM*, HATCHETT and ANDERSON, Circuit Judges.

* Honorable Joe Ingraham, U. S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. *Lummus Industries, Inc.*, 254 NLRB No. 79 (1981), 1980–81 NLRB Dec. (CCH) ¶ 17,833.

INGRAHAM, Circuit Judge:

The National Labor Relations Board ("Board") petitions this court for enforcement of its order[1] directing reinstatement of a discharged employee and related relief. We find substantial evidence to support the Board's conclusions that the respondent Lummus Industries, Inc. ("Lummus"), violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by discharging the employee for conduct that constituted protected concerted activity under § 7 of the Act; and also that Lummus maintained overbroad no-distribution and no-solicitation rules. We accordingly enforce the Board's order.

## I—BACKGROUND

Lummus manufactures cotton ginning equipment at its plant in Columbus, Georgia. The company's seven hundred to seven hundred and fifty employees are represented by Local 1870 of the International Association of Machinists and Aerospace Workers. The employee in question, Chester Pumphrey, a member of the union, was hired in November 1977 as a machine shop trainee and worked for Lummus until his discharge on July 18, 1979.

The Administrative Law Judge found that Pumphrey began a campaign to improve the effectiveness of the union's representation as early as October 1978. These early efforts included canvassing fellow employees for ideas and suggestions and conveying this information to the union and the company, in person and through the company's suggestion forms. The record does not reflect the response, if any, this activity produced.

In late April 1979, Pumphrey prepared a one-page leaflet purporting to summarize his observations and beliefs concerning specific working conditions and the adequacy of union representation.[2] The opening paragraph refers to allegedly disproportion-

2. The leaflet, introduced as General Counsel Exhibit 3, is reproduced as an appendix to this opinion.

ate cost of living adjustments for "Journeymen" as opposed to employees in the lower wage range. Paragraph 2 states that employees in the lower wage range did not receive evaluations and wage reviews in May and September "as many of them no doubt think they are supposed to." Paragraph 3 states "one of the members of the team that negotiated that sorry contract is now our union president." Paragraph 4 contends that workers who invested in tools and instruments were not adequately compensated, and refers to the $4 an hour wage rate of some employees as a "starvation wage." Paragraphs 5 and 6 complain about the lack of an effective suggestions system and adequate training program. Paragraph 7 states that under the current contract, union officials could "sit on their hands" and bind the employees to an automatic renewal of the existing contract without any negotiation of improved wages or benefits. Paragraph 8 states:

> There is a common feeling that during the entire 44 years that the I.A.M. has represented Lummus employees, there has been some kind of sell out every time contract negotiation time came around. There must be some truth to this, considering the starvation wage that most of us enjoy.

Pumphrey then inserted the phrase "I believe that:" and added three concluding paragraphs. Paragraphs 1 and 2 of this section appeal to the work force at large to articulate its desires and instruct the union negotiating team to bargain accordingly. Paragraph 3 states:

> Realizing that it takes some kind of superhuman character to resist the temptation to accept a several thousand dollar bonus in exchange for a weak contract or even pursuant to Article XXII, no contract, which the company can easily afford, we should not be paranoid, but must be eternally watchful of the leadership.

The leaflet closes with an invitation to meet at Pumphrey's house to discuss the matters outlined in the leaflet.

Pumphrey distributed copies of this material to several employees with whom he had spoken previously. He denied posting any copies on any of the bulletin boards around the plant. Around May 1, however, a copy was found on a company bulletin board and taken to the night shift supervisor, Lamar Stone. On May 9 Pumphrey was called into Stone's office, together with a company lead man, shop steward and union committeeman. Pumphrey admitted authoring the leaflet although he denied posting it. After reading the leaflet aloud, Stone told Pumphrey he was causing dissension and trying to drive a wedge between the company and the union. With reference to paragraph 8 and paragraph 3 of the "belief" section, Stone told Pumphrey that the company would not tolerate allegations of sellouts or bribery, and asked if Pumphrey could prove such allegations. Pumphrey replied that he had no such proof but that the leaflet expressed his beliefs. Stone then warned Pumphrey not to post any material on company bulletin boards without permission from the company, and not to "be caught distributing unionizing literature on company property any time." On cross-examination Stone testified his interpretation of "company time," to which his warning applied, included any time the company was paying the employee, including break time. This meeting resulted only in an oral warning.

On June 11, the company Industrial Relations Manager John Moore was told that another copy of the leaflet had been posted. Pumphrey was called to Moore's office on June 12 for a meeting with Moore, a union steward, company supervisor and the plant manager. Once again Pumphrey admitted authoring the leaflet, although he denied posting it, and that he had no actual proof of bribery or sellouts but believed such a situation was possible. Moore and the plant manager apparently both told Pumphrey that the bribery and sellout allegations were unacceptable to the company, and read company rules 8[3] and 17[4] aloud to

---

3. Rule 8 provides that disciplinary action may be taken for "posting or removing any material on official company bulletin boards or distributing written or printed matter of any descrip-

tion at any time unless authorized by the Lummus Personnel Department."

4. Rule 17 provides disciplinary action may be taken for "making maliciously false or slander-

Pumphrey. These officials gave Pumphrey a "strong" oral warning that the next infraction of these rules would lead to discharge. No further incidents involving this leaflet appear in the record.

Around July 11, Pumphrey began a telephone survey that he testified was intended to ascertain "the opinions and attitudes of the work force concerning our wages, our union, our union leadership, . . . [and] whether they believe[d] . . . the rumors that they might have heard concerning sellouts." Pumphrey began by selecting four names at random from a seniority list posted at the plant. The results of his survey can be briefly summarized. On his initial attempts Pumphrey was able to reach two of the employees and asked them a series of questions about contract provisions, union representation, and whether they believed the union had been selling out. These two employees apparently answered the questions and completed the conversations without indicating any irritation or hostility. However, both employees reported the conversations to union officials, who then requested they further report the calls to the Industrial Relations Manager, Moore. Because Pumphrey was working on a night shift and made his calls during the day, he contacted the wives of the two remaining employees on his list. The ALJ found that the wives were upset by Pumphrey's questions, principally because they did not understand the purpose of the calls. Pumphrey nevertheless testified that the wives gave him useful suggestions about desirable contract provisions, such as health insurance and no-strike clauses. The two husbands, however, were angry that Pumphrey had disturbed their wives and both complained about the calls to union and company officials.

On July 18, Moore again called Pumphrey into his office. Moore had prepared a separation notice citing rule 17 (false and slanderous statements) as the ground for discharge. In response to Moore's questioning Pumphrey acknowledged making the telephone survey. Moore then informed Pumphrey that based on this continued conduct, following the two prior warnings, he was discharged.

The ALJ concluded that the company's no-solicitation and no-distribution rules were overbroad and improperly infringed on employees' section 7 right to communicate with fellow employees. Because these rules were the basis of the May and June warnings to Pumphrey, the ALJ continued, these warnings and the subsequent discharge were also unlawful. The ALJ also observed that there was no evidence that Pumphrey's activities caused any significant interference with production. Finally, the ALJ concluded that the allegations concerning bribery and sellouts, as well as the remainder of Pumphrey's communications, constituted protected concerted activity under section 7, so that his discharge constituted an unfair labor practice. The Board adopted these findings and conclusions and ordered Lummus to rescind the no-distribution and no-solicitation rules to the extent they prohibited distribution and solicitation during non-working time in non-working areas of the plant, and to offer reinstatement to Pumphrey and make him whole for loss of earnings (among other relief).[5]

## II—DISCUSSION

Section 7 of the Act guarantees the right of employees, among other rights, "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (1976). Section 8(a)(1) provides that it is an

ous statements regarding another employee, a supervisor, a Company official, the Company and/or its customers."

5. According to the familiar standard of review, we must affirm the Board's findings if they are supported by substantial evidence on the rec-

ord considered as a whole. 29 U.S.C. § 160(e) (1976); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Electric Machinery Co. v. NLRB*, 653 F.2d 958, 962 (5th Cir. 1981).

unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" section 7 rights. 29 U.S.C. § 158(a)(1) (1976). As is apparent from the language of these sections, a discharge precipitated by the exercise of section 7 rights is an unfair labor practice entitling the discharged employees to the remedies provided in the Act. *See e.g., Brown & Root v. NLRB*, 634 F.2d 816, 818 (5th Cir. 1981); *Richardson Paint Co., Inc. v. NLRB*, 574 F.2d 1195, 1207 (5th Cir. 1978).

■ Although employers may lawfully regulate distribution of literature or solicitation of opinion concerning working conditions in work areas or during work time, attempts to prohibit such activity in non-work areas or on nonwork time are presumptively invalid unless the employer shows that a ban is necessary to maintain plant discipline or production. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 570–76, 98 S.Ct. 2505, 2514–2517, 57 L.Ed.2d 428 (1978); *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *NLRB v. Transcon Lines*, 599 F.2d 719, 721 (5th Cir. 1979). Lummus concedes that its no-distribution and no-solicitation rules are overbroad under this standard. The record indicates that the rules were cited to Pumphrey during his May and June meetings with company and union officials, and there is substantial evidence that the company sought to justify disciplinary action, in part, on these rules. *Cf. Florida Steel Corp. v. NLRB*, 529 F.2d 1225, 1230–31 (5th Cir.

1976) (reprimand for violation of unlawful no-solicitation rule violates section 8(a)(1)). However, in view of the company's concession of the overbreadth of these rules, we will enforce the portions of the Board's award relating to the rules without further discussion. *See Dreis & Krump Mfg. Co., Inc. v. NLRB*, 544 F.2d 320, 325 (7th Cir. 1976), *citing Riverside Press, Inc. v. NLRB*, 415 F.2d 281, 284–85 (5th Cir. 1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970).

■ The company strenuously argues that these rules, in fact, had nothing to do with Pumphrey's discharge. In its view, the record shows that company officials were concerned only about Pumphrey's comments regarding bribery and sellouts. Lummus seeks to justify the discharge on the ground that Pumphrey was warned if he did not have proof of such allegations he should stop circulating them; accordingly, the company explains, he was discharged for "engaging in the rumor mill" and making unfounded accusations that the company bribed union officials. We agree with the Board, contrary to the company's characterization of the case, that Pumphrey's conduct was protected activity in the circumstances of this case.[6]

All of Pumphrey's activities as reflected in the record were aimed at evaluating the adequacy of the union's representation of Lummus employees, and seeking improvement of that representation. These are clearly protected concerted[7] activities un-

---

6. We note in passing that this is not a "mixed-motive" discharge case, and therefore we are not required to analyze the application of *Wright Line, a Division of Wright Line*, 251 NLRB 1083 (1980), *enforced on different grounds, NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). The former Fifth Circuit has apparently cited *Wright Line* without expressing any disapproval of the rules governing burdens of proof announced in that case. *See NLRB v. Charles H. McCauley Associates*, 657 F.2d 685, 688 (5th Cir. 1981); *NLRB v. Robin American*, 654 F.2d 1022, 1025 (5th Cir. 1981). *See also Red Ball Motor Freight v. NLRB*, 660 F.2d 626 (5th Cir. 1981). In the case before us we have no opportunity to consider whether the discharge would have been

justified by a legitimate ground, because we find both asserted reasons for the discharge, the violation of invalid company rules and accusations against the company, would be unlawful grounds for discharge.

7. Lummus also contends that Pumphrey's activities were not "concerted." Examination of the leaflet, however, and the evidence of the questions asked during Pumphrey's phone survey, leaves no doubt that these communications are an exhortation directed toward group activity on matters of common concern. *See NLRB v. Datapoint Corp.*, 642 F.2d 123, 128–29 (5th Cir. 1981). The activities are therefore concerted, and the mere fact that Pumphrey apparently was acting alone during the time in question does not change this result. *Anchor-*

der section 7. *NLRB v. Transcon Lines*, 599 F.2d 719, 721 (5th Cir. 1979); *Cooper Tire & Rubber Co. v. NLRB*, 443 F.2d 338, 339 (6th Cir. 1971); *Nu-Car Carriers, Inc.*, 88 NLRB 75 (1950), *enforced*, 189 F.2d 756 (3d Cir. 1951), *cert. denied*, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). *See also Eastex, Inc. v. NLRB*, 437 U.S. 556, 574 n.23 (1978) (collecting Board cases). Pumphrey's comments regarding sellouts and possible bribery, therefore, were made in the context of and were intertwined with protected activity. The inquiry then becomes whether the nature of such comments or the manner in which they were delivered places them beyond the protection of the Act. *See Dreis & Krump Mfg. Co. v. NLRB*, 544 F.2d 320, 328–29 (7th Cir. 1976) ("communications occurring during the course of otherwise protected activity remain likewise protected unless found to be 'so violent or of such serious character as to render the employee unfit for further service.' ") (cites omitted); *Crown Central Petroleum Corp. v. NLRB*, 430 F.2d 724, 729–30 (5th Cir. 1970); *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 586–87 (7th Cir. 1965); *United States Postal Service*, 250 NLRB 4, 4 n.1 (1980). *Cf. Montefiore Hospital & Medical Center v. NLRB*, 621 F.2d 510, 517 (2d Cir. 1980) (employees forfeit protection of Act by sufficiently egregious conduct).

■ In the specific context of allegedly false and defamatory statements, the statements will be protected unless they are made with knowledge of their falsity or with reckless disregard for their truth or falsity. *See Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 63, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1966) ("the most repulsive speech enjoys immunity provided it falls short of a deliberate and reckless untruth"); *Altex Ready Mixed Concrete Corp. v. NLRB*, 542 F.2d 295, 297 (5th Cir. 1976); *Texaco, Inc. v. NLRB*, 462 F.2d 812, 814–15 (3d Cir.), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 302 (1972); *Owens-Corning Fiberglass Corp. v.* tank *v. NLRB*, 618 F.2d 1153, 1160 (5th Cir. 1980); *Richardson Paint Co., Inc. v. NLRB*, 574

*NLRB*, 407 F.2d 1357, 1366–67 (4th Cir. 1969); *Hawthorne Mazda, Inc.*, 251 NLRB 313, 316 (1980), *enforced*, 659 F.2d 1089 (9th Cir. 1981). The *Owens-Corning* court made the following particularly relevant observation:

Employees do not forfeit the protection of the Act if, in voicing their dissatisfaction with matters of common concern, they give currency to inaccurate information, provided it is not deliberately or maliciously false.

407 F.2d at 1366, *quoting Walls Mfg. Co., Inc.*, 137 NLRB 1317 (1962), *enforced*, 321 F.2d 753 (D.C.Cir.), *cert. denied*, 375 U.S. 923, 84 S.Ct. 265, 11 L.Ed.2d 166 (1963). Each case must be decided on its particular facts; consequently the primary responsibility for drawing the line between protected and unprotected activity falls on the Board. *American Telephone & Telegraph Co., v. NLRB*, 521 F.2d 1159, 1161 (2d Cir. 1975); *NLRB v. Leece-Neville Co.*, 396 F.2d 773, 774 (5th Cir. 1968).

The Board's determination in this case is amply supported by the record, is neither arbitrary or illogical, and therefore must be enforced. *See American Telephone & Telegraph Co., supra.* There is absolutely no evidence that Pumphrey was accusing the company of bribery knowing such accusation was false or with reckless disregard for the truth. Indeed, we agree with the Board that Pumphrey was not actually making "accusations" in either his leaflet or telephone survey, but rather was trying to find out whether other employees had heard rumors of sell outs or suspected the union of selling out. The ALJ specifically noted evidence that rumors of sell outs had preceded Pumphrey's circulation of his leaflet. In this regard, the company's argument that it was justified in discharging Pumphrey after he acknowledged he had no proof is unpersuasive; Pumphrey's telephone survey could be explained in part as an attempt to discover whether such proof existed. *Cf. NLRB v. Cement Transport*, 490 F.2d 1195, 1206–07 (5th Cir. 1978).

F.2d 1024, 1031 (6th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974) (employee unlawfully terminated for circulating allegedly "totally baseless" bribery rumor when some reason to suspect such activity may have existed); *NLRB v. Ben Pekin*, 452 F.2d 205 (7th Cir. 1971). As the *Cement Transport* court indicated, activity such as Pumphrey's that is not engaged in with deliberate knowledge or reckless disregard of falsity is included in the "uninhibited, robust, and wide-open debate in labor disputes" favored by the federal labor laws. *Letter Carriers v. Austin*, 418 U.S. 264, 273, 94 S.Ct. 2770, 2776, 41 L.Ed.2d 745 (1974).[8]

Enforcement of this order does not mean the condonation of disloyalty, gross insubordination, or statements that are made with knowledge of falsity or reckless disregard for falsity. *Cf. NLRB v. Local 1229, IBEW (Jefferson Standard)*, 346 U.S. 464, 472, 74 S.Ct. 172, 176, 98 L.Ed. 195 (1953) ("There is no more elemental cause for discharge of an employee than disloyalty to an employer"); *Timpte, Inc. v. NLRB*, 590 F.2d 871, 873–76 (10th Cir. 1979) (profanity and disparagement of company officials was, under circumstances, indefensible); *New Fairview Hall Convalescent Home*, 206 NLRB 688 (1973), *enforced, Donovan v. NLRB*, 520 F.2d 1316 (2d Cir. 1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed. 642 (1976) (bribery incident fabricated by employee). We merely hold that the record supports the Board's conclusion that the conduct in this case was not beyond the pale.

ENFORCED.

## APPENDIX

1. During the term of the current contract, employees in the $4.00 or so wage range got a real shafting. That is, their contractual (inflationary) raises have amounted to a mere 10 to 15 percent, while Journeymen pay has been raised by 29 percent.

2. Under the current contract, people in the wage range of $4.10 to $5.70 do not get evaluated and considered for a raise in May and September as many of them no doubt think they are supposed to. This little fact is carefully hidden in the complex wording of Article XVII of the contract, and by a fine line drawn across page 43 of the contract, which looks as if may be a smudge from the machine that printed the book.

3. One of the members of the team that negotiated that sorry contract is now our union president.

4. Not enough has ever been done (monetarily) to compensate those who invest large amounts of money in tools and instruments in order to be able to perform high quality work. Likewise, there is really no incentive for others who are now working for $4.00 or so per hour, which is a starvation wage, to buy any, either.

5. Quality and quantity of production, and directly, our wages are seriously affected by the fact that there is no suggestion program to speak of. In any decent work environment, management should be highly receptive to suggestions from the workforce, and should, in fact, upon adoption of good ones, monetarily reward or otherwise recognize the people who have the initiative to make them.

6. There is no excuse for not having a good training program. During my first 3 or 4 months I broke many dollars worth of equipment because the fellow who put me to work on a particular job didn't tell me slightest damn thing concerning a tool or device that I had never seen the like of before in my life. I have seen a trainee who admitted to having never in his life worked with his hands being put to work on a lathe without the slightest instruction, Thereafter, hours and hours went by without any supervisory person stopping by to

8. There is also substantial evidence to support the Board's conclusion that, while Pumphrey's calls to four employees out of over seven hundred caused some "upset," there was no interference with production or significant loss of work time, no violence, and a minuscule threat to plant order and discipline if any threat at all.

see how he was doing. He quit after 3 or 4 weeks, apparently in disgust.

7. Under Article XXII of the current contract, if the Union local president and his crew of elected officers were to "sit on their hands" and fail to send a simple letter to the company, we would be bound to go another year without a new contract, and apparently no more raises or any new benefits for anyone.

8. There is a common feeling that during the entire 44 years that the I.A.M. has represented Lummus employees, there has been some kind of sell out every time contract negotiation time came around. There must be some truth to this, considering the starvation wage that most of us enjoy.

I believe that:

1. No newly appointed nor long ago elected standing committee should be able to unilaterally decide what is best for all of us, and for what benefits and working conditions we shall negotiate. In contrast, I think the membership at large should INSTRUCT that team for what it shall negotiate.

2. It is high time we get on with the process of deciding what WE want and so instructing that committee.

3. Realizing that it takes some kind of superhuman character to resist the temptation to accept a several thousand dollar bonus in exchange for a weak contract or even Pursuant to Article XXII, no contract, which the company can easily afford, we should not be paranoid, but must be eternally watchful of the leadership.

If you agree with some, most, of all of this, then meet me at my house, 2533 Cornell Ave at 2:00 tomorrow, Saturday, to get our stuff together. My Phone: 689 4318