# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 5, 2006          Decided July 14, 2006

No. 05-1371

ENDICOTT INTERCONNECT TECHNOLOGIES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

No. 05-1381

NATIONAL LABOR RELATIONS BOARD,
CROSS-PETITIONER

v.

ENDICOTT INTERCONNECT TECHNOLOGIES, INC.,
RESPONDENT

———

On Petition for Review and
Cross-Application for Enforcement
of an Order of the National Labor Relations Board

———

*Raymond J. Pascucci* argued the cause for Endicott Interconnect Technologies, Inc.

*Christopher W. Young*, Attorney, National Labor Relations Board, argued the cause for the National Labor Relations Board. *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Meredith L. Jason*, Attorney, National Labor Relations Board, were on brief. *Daniel A. Blitz*, Attorney, National Labor Relations Board, entered an appearance.

Before: HENDERSON, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Endicott Interconnect Technologies (EIT) petitions for review of an order of the National Labor Relations Board (NLRB or Board) concluding that EIT violated section 8(a)(1) of the National Labor Relations Act (NLRA or Act). *See Endicott Interconnect Techs., Inc*., 345 N.L.R.B. No. 28 (Aug. 27, 2005) (NLRB Op.). Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7 of the NLRA]." 29 U.S.C. § 158(a)(1). Included among the employee rights enumerated in section 7 is the right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The Board found that EIT violated section 8(a)(1) on two occasions: (1) when one of its owners threatened to discharge employee Richard White for making a disparaging remark to a newspaper reporter about the company's loss of technical expertise after a large lay-off and (2) when the owner discharged White after he posted a message on the newspaper's website criticizing the owner's managerial abilities. We conclude that White's communications were so disloyal to EIT as to remove them from section 7's protection and that the Board erred in holding otherwise.

**I.**

In 2002 EIT purchased a computer circuit board manufacturing facility in Endicott, New York from International Business Machines Corporation (IBM), which had been contemplating "massive layoffs" at the plant.[1] NLRB Op. at 1. At the time of the purchase Alliance@IBM/Communications Workers of America, Local 1701, AFL-CIO, (Local 1701) had been trying unsuccessfully to organize the facility's workers for several years. Following the sale, IBM became the predominant purchaser of EIT's circuit boards, accounting for about sixty per cent of its sales.

On November 15, 2002, two weeks after the sale was completed, EIT permanently laid off 200 employees, about ten per cent of its workforce. The same day, Local 1701 contacted employee White, who was a union member, and requested that he speak to a reporter for the *Binghamton Press & Sun-Bulletin* in connection with an article about the lay-offs. On November 16, 2002, the newspaper published a story based in part on the reporter's interview with White. The article characterized White as among those EIT employees who disagreed with management's lay-off decision because it would "hurt the company over the long term." NLRB Op. at 2. The article reported White's statements as follows:

> "There's gaping holes in this business," said Rick White, an employee with 28 years at the Endicott plant who, with nearly 2,000 other people, recently transferred from IBM to Endicott Interconnect. White, who kept his job,

---

[1] According to the Board, EIT's motivation in acquiring the company "was, in part, to protect the local economy from massive layoffs being contemplated by IBM, and in part to take advantage of a potentially profitable business investment." NLRB Op. at 1. The State of New York provided financial assistance for the acquisition "[i]n exchange for [EIT's] commitment to maintain jobs at the facility." *Id.*

said development and support people with specific knowledge of unique processes were let go, leaving voids in the critical knowledge base for the highly technical business.

NLRB Op. at 2. The article also quoted James J. McNamara, Jr., EIT's president and chief executive officer, who defended the reduction in force.

The day the article was published, William Maines, one of EIT's owners, received a telephone call from Thomas Calfield, an IBM vice president responsible for procuring circuit boards. Having read White's statements in the newspaper article, Calfield expressed concern over whether EIT had "gutted" its engineering staff and as a consequence had "gaping holes." Tr. 128; Joint App. (JA) 186. Maines assured Calfield that there was no reason for concern.

On November 19, 2002 Maines met with White and expressed displeasure over his comments in the newspaper which, he said, "disparaged the Company in violation of the company Handbook" and he "threatened to terminate White if it happened again." NLRB Op. at 2. White said he was "on board" and it would not happen again. JA 79, 268.

On December 1, 2002 White posted a message on a website that the *Press & Sun-Bulletin* maintained as a public forum for comment on EIT's acquisition of the plant. Responding to an anti-union posting on the site, White wrote:

To Mr. House: Why do you continue to try to bundle reasons why a union is suspect and not so desirable for EIT employees? Why do you site [sic] all the bad things about Unions, and ignore all the bad things that IBM and EIT have done to the employees and their families and the community at large? Isn't it about time you seriously thought about the fact that no one else will help to stop the job losses, and root for the workers of the

community instead of defending the likes of Bill Maines, George Pataki, and Tom Libous? Hasn't there been enough divisiveness among the people working in this area? Isn't it about time we stood up for our jobs, our homes, our families and our way of life here? Do you want to sit by and watch this area go to hell and dissolve into a welfare town for people over 70? This business is being tanked by a group of people that have no good ability to manage it. They will put it into the dirt just like the companies of the past that were "saved" by Tom Libous and George Pataki, i.e., "Telespectrum", "IFT (Flex)". When are you going to get it??? A union is not just a protection for the employees. It's an organization that collectively fights for improvements and benefits for working people in communities like ours. Forget Jimmy Hoffa and the mob. Those people and situations are stereotypes of fools who chose to undermine the very system they vowed to protect. They are the minority and always have been. Look around. Do you think the government will help you when you lose your job and your house? Think again. A union is the beginning of a community standing up for itself. It's [sic] time is now.

NLRB Op. at 2.

On December 19, 2002 Maines again met with White and, after pointing out that White had "disparaged EIT again," discharged him, "consistent with Maines' warning of November 19." NLRB Op. at 2.

The NLRB General Counsel filed a complaint in April 2003 alleging the November 19, 2002 threat and the December 19,

2002 discharge violated section 8(a)(1) and (3) of the NLRA.[2] After a hearing on June 19, 2003 the administrative law judge issued a decision in which he found EIT violated section 8(a)(1) and ordered that EIT reinstate White.[3] *Endicott Interconnect Techs., Inc.*, No. 3-CA-24105 (Aug. 7, 2003). EIT filed exceptions to the decision with the NLRB.

In a two-to-one decision issued August 27, 2005 the Board upheld the finding of violation under *NLRB v. Electrical Workers Local 1229* (*Jefferson Standard*), 346 U.S. 464 (1953), in which the United States Supreme Court set out the standard for determining whether an employee's actions are protected under section 7 of the Act. The Court there explained that when an employee "attacks" his employer, whether or not he is engaged in "a concerted activity wholly or partly within the scope of those mentioned in § 7," the attack will deprive the employee of section 7's protection if it constitutes "insubordination, disobedience or disloyalty," which, the Court made clear, is "adequate cause for discharge." 346 U.S. at 477-78, 475. The Board found that White's statements in both the article and the web posting constituted "concerted activities" protected under section 7 of the Act because they were related to a "labor dispute"—in the former, to the 200-person lay-off and in the latter, to both the lay-off and the ongoing union organization drive. The Board further determined White's comments were "not so misleading, inaccurate, or reckless, or otherwise outside the bounds of permissible speech, to cause

---

[2]Section 8(a)(3) makes it an unfair labor practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

[3]The administrative law judge dismissed the 8(a)(3) allegation for failure to establish anti-union animus.

[him] to lose the Act's protection.' "[4]  NLRB Op. at 5 (quoting *Titanium Metals Corp.*, 340 N.L.R.B. 766, 766 n.3 (2003), *review granted and enforcement denied on other ground*, 392 F.3d 439 (D.C. Cir. 2004)) (alteration in original).  EIT filed a timely petition for review and the Board filed a cross-application for enforcement.

**II.**

"We will affirm the judgment of the Board unless, 'upon reviewing the record as a whole, [this Court] conclude[s] that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.' " *Beverly Health & Rehab. Servs., Inc. v. NLRB*, 317 F.3d 316, 320 (D.C. Cir. 2003) (quoting *Tradesman Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1141 (D.C. Cir. 2002)) (alterations in original).  For the reasons set out below, we conclude the Board misapplied *Jefferson Standard* and its progeny to the facts of this case and we therefore set aside its decision.

In *Jefferson Standard*, the Supreme Court upheld the Board's determination that a television broadcaster in Charlotte, North Carolina did not violate the Act when it discharged a group of nine technicians who had distributed a handbill criticizing the quality of the station's programming and suggesting the station considered Charlotte a "second-class" city.  346 U.S. at 468.  The Court found the handbill constituted "a demonstration of such detrimental disloyalty as to provide

---

[4]Dissenting Board Chairman Battista concluded that White's comments in the article and on the internet "were unprotected by the Act because they failed to reference an ongoing labor dispute and because they were disloyal to [EIT]" and that EIT "was, therefore, fully within its rights to discipline White because of the November 16 article, and to discharge him for cause because of the December 1 posting."  NLRB Op. at 6-7 (Battista, Chairman, dissenting).

'cause' for its refusal to continue in its employ the perpetrators of the attack." 346 U.S. at 472. The Court explained that, although section 7 of the NLRA "safeguard[s] . . . the right of employees to engage in 'concerted activities for the purpose of collective bargaining or other mutual aid or protection,' " *id*. at 473, it does not override the employer's authority to discharge "for cause" under section 10(c) of the Act, which expressly provides: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c); *see also George A. Hormel & Co. v. NLRB*, 962 F.2d 1061, 1064 (D.C. Cir. 1992) ("Nothing in the Act prevents an employer from disciplining or discharging an employee for disloyalty . . . ."). The Court found it immaterial that the technicians' union was contemporaneously picketing the company and distributing handbills related to a bona fide labor dispute (the station's refusal to renew a provision in the expired collective bargaining agreement) because "[t]he fortuity of the coexistence of a labor dispute affords . . . no substantial defense." 346 U.S. at 476; *see id* at 477-78. Thus, the bona fide labor dispute notwithstanding, the station was justified in discharging the nine technicians "because, at a critical time in the initiation of the company's television service, they sponsored or distributed 5,000 handbills making a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income." *Id*. at 471.

Following *Jefferson Standard*, the Board has formulated its own two-part test under which an employee's communication to a third party is deemed protected under section 7 if, first, it is related to an ongoing labor dispute and, second, it is "not so disloyal, reckless or maliciously untrue as to lose the Act's protection." *Am. Golf Corp*., 330 N.L.R.B. 1238, 1240 (2000)

(*Mountain Shadows*); *see also Cincinnati Suburban Press*, 289 N.L.R.B. 966, 967-968 (1988); *Emarco, Inc.*, 284 N.L.R.B. 832, 833 (1987); *Richboro Cmty. Mental Health Council*, 242 N.L.R.B. 1267 (1979). Although the Board's formulation accurately reflects the holding in *Jefferson Standard*, we conclude that in this case the Board misapplied the second part of the test.[5]

The Board initially characterized the second prong of the test correctly as requiring that the speech not be "so disloyal, reckless or maliciously untrue as to lose the Act's protection," NLRB Op. at 3 (quoting *Mountain Shadows*, 330 N.L.R.B. at 1240). In examining White's particular communications, however, the Board seemingly ignored the very attribute that justified discharging the technicians in *Jefferson Standard* for cause: the "detrimental disloyalty" of their assault on their employer. 346 U.S. at 472; *see* NLRB Op. at 5 (finding White's communications "not so misleading, inaccurate, or reckless, or otherwise outside the bounds of permissible speech, to cause [him] to lose the Act's protection,' " with no mention of disloyalty) (quoting *Titanium Metals Corp.*, 340 N.L.R.B. at 766 n.3) (alteration in original). And White's communications were unquestionably detrimentally disloyal.

In the November 16, 2001 newspaper article, White, identified as an employee of 28 years' experience, stated there were "gaping holes" in EIT's business and that "development and support people with specific knowledge of unique processes were let go, leaving voids in the critical knowledge base for the highly technical business." NLRB Op. at 2. The damaging

---

[5]It is therefore unnecessary to decide whether the Board properly determined that White's communications constituted protected activity under the test's first prong because his statements to the reporter were related to the 200-employee lay-off and the internet posting was related to both the lay-off and the ongoing union organization drive.

effect of the disloyal statements, made by an experienced insider at a time when EIT was struggling to get up and running under new management, is obvious from the immediate reaction of IBM's vice president, who telephoned Maines concerned about EIT's continuing ability to supply IBM's circuit board needs. The critical nature and injurious  effect of White's newspaper comments alone gave EIT "cause" to immediately discharge him.  Nonetheless, Maines gave a second chance to White, who agreed not to repeat such behavior.  Yet, two weeks later he did just that when he posted his message on the internet and caustically attacked EIT management—and William Maines, in particular, alleging that he lacked "good ability to manage" EIT, was causing the business to be "tanked" and was going to "put it into the dirt."  NLRB Op. at 2.  As in *Jefferson Standard*, the communications here constituted "a sharp, public, disparaging attack upon the quality of the company's product and its business policies" at a "critical time" for the company. *Jefferson Standard*, 346 U.S. at 471.  Thus, as in *Jefferson Standard*, the disloyal, disparaging and injurious nature of White's attacks on the company "ha[s] deprived [him] of the protection of that section, when read in the light and context of the purpose of the Act." *Id*. at 477-78.  We therefore conclude that EIT did not violate the Act when it discharged White for cause.  Accordingly, we grant EIT's petition for review, deny the Board's cross-application for enforcement and vacate the Board's order.

*So ordered*

KAREN LeCRAFT HENDERSON, *Circuit Judge, concurring*:

I concur in the majority opinion because I agree that White's statements were not protected under the second prong of the *Jefferson Standard* test as iterated in the Board's decisions. I write separately to express my opinion that the statements did not satisfy the test's first prong which requires that they relate to an ongoing labor dispute—an issue the majority does not reach, *see* maj. op. at 9 n.5. As the dissenting Board chairman observed, although both the article and the posting included references to labor disputes, the specific statements that precipitated EIT's ultimate discharge of White related not to any labor issue but to the capabilities of EIT and its management. *See* NLRB Op. at 5-7 (Battista, Chairman, dissenting). Thus, I do not believe that White's communications qualify for protection under section 7 in the first place.