# United States Court of Appeals
## For the First Circuit

No. 07-1316

FIVE STAR TRANSPORTATION, INC.,

Petitioner, Appellant,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Appellee,

UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 1459,

Intervenor.

ON PETITION FOR REVIEW OF AN ORDER OF THE
NATIONAL LABOR RELATIONS BOARD

Before

Torruella, <u>Circuit Judge</u>,
Cyr, <u>Senior Circuit Judge</u>,
and Lynch, <u>Circuit Judge</u>.

<u>Robert L. Dambrov</u>, with whom <u>Cooley, Shrair P.D.</u> was on brief, for petitioner.
<u>Philip A. Hostak</u>, Attorney, National Labor Relations Board, with whom <u>Robert J. Englehart</u>, Supervisory Attorney, were on brief, for respondent.
<u>David B. Rome</u>, <u>Laurie R. Houle</u>, and <u>Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C.</u> were on brief, for intervenor Transportation Division, United Food & Commercial Workers, Local 1459, AFL-CIO.

March 31, 2008

**TORRUELLA**, **Circuit Judge**. Petitioner Five Star Transportation, Inc. ("Five Star") seeks judicial review of the decision of the National Labor Relations Board ("NLRB") finding that it engaged in an unfair labor practice in violation of § 8(a)(1) of the National Labor Relations Act ("Act") when it refused to hire, or even consider for hire, six school bus drivers who wrote critical letters and email messages to the Belchertown School District ("District") in an effort to dissuade it from granting Five Star a bus services contract for the 2003 through 2006 school terms. After a thorough review of the record, we reject Five Star's claims and enforce the NLRB's decision.

## I. Background

We recount the facts as found by the NLRB. The Belchertown, Massachusetts, School District has a practice of contracting with private bus companies to provide transportation services for its students. Such contracts usually last for three years and are secured through a competitive bidding process. The 2000-2003 bus services contract was awarded to a company now known as First Student, Inc. ("First Student"). Upon assuming operations, First Student recognized the United Food and Commercial Workers Union, Local 1459 ("Union") as the bargaining representative for its drivers, and First Student and the Union entered into a series of collective-bargaining agreements governing wages, work rules, and fringe benefits.

In early January of 2003, nearing the expiration of the District's contract with First Student, the District began organizing the bid process for awarding the 2003-2006 bus services contract. As a part of the bid specifications distributed to potential vendors, the District required that any new vendor give current drivers "first consideration for employment." The Union vice-president, Daniel Clifford, also wrote to all prospective bidders notifying them of the Union's representation of the Belchertown school bus drivers, and stating the Union's desire to continue such representation regardless of which company won the contract.

At the January 16, 2003 "bid opening" meeting, Five Star submitted the lowest bid. Thereafter, on January 21, Clifford wrote to the District expressing his concern that Five Star's bid was so low -- nearly $300,000 lower than the then-current contract -- that it was questionable whether it would be able to maintain the drivers' wage and benefit levels, and the safe and effective service, then provided by First Student. Clifford also requested that all bidders be required to offer employment to the incumbent vendor's drivers "at a level of wages and benefits no less than provided by the predecessor," and submitted a draft resolution for the School Board on the matter.

That same day, Clifford also faxed a letter to Teresa Lecrenski, the president of Five Star, requesting her guarantee

that Five Star would voluntarily recognize the Union as the drivers' bargaining representative, would continue the drivers' employment with full seniority, and would meet with the Union to negotiate a successor collective-bargaining agreement. The letter further stated:

> If we do not hear back from you promptly on these issues, we will infer that you do not intend to cooperate in these reasonable demands on behalf of our members and if you are awarded the contract, we will exercise all of our legal options as aggressively as a labor union could be expected to protect the hard-won benefits of its members.

Lecrenski did not respond to Clifford's letter.

On January 31, Clifford held a meeting with a group of Belchertown school bus drivers to discuss the implications of Five Star's bid on the drivers' wages, benefits, and work conditions. At the meeting, two former Five Star employees spoke about their negative experiences with Five Star, including job instability and untimely responses to bus breakdowns and mechanical problems. Clifford also distributed newspaper articles documenting several safety incidents that had marred the company in 1996. Following the presentation, Clifford urged the Belchertown drivers to write to the District expressing their concerns, and provided them with the names and addresses of District officials, and a sample letter requesting that the District rebid the 2003-2006 contract with the stipulation that all bidders commit to honoring the terms of the then-current collective-bargaining agreement.

Between February 3 and February 8, the District received fifteen letters from Belchertown school bus drivers. These letters varied widely in content and tone, but most of them expressed the drivers' concern that, in the event Five Star won the transportation contract, they be allowed to continue in their jobs at the then-current wage and benefit levels, and in a safe working environment. The awarding of the contract was delayed while the District considered the issues raised by the letters, but on February 24, Five Star was officially awarded the school bus service contract for the 2003 through 2006 terms.

Prior to securing the contract, Lecrenski had been notified by the District of the existence of the letters and, at her request, she was granted copies of them. After Five Star was awarded the bus services contract, seventeen former First Student drivers who were members of the Union bargaining unit applied for a position at Five Star. Of these, only six were hired. Lecrenski admits that the sole reason the other eleven applicants were not hired or even considered was because they had written letters critical of Five Star.

On August 14, the Union filed a charge against Five Star with the NLRB alleging that "[b]y failing to hire former unionized Belchertown bus drivers, the Company ha[d] discriminated against them because of their protected and concerted activity." On March 17, 2004, the NLRB General Counsel ("General Counsel") filed

his Complaint and Notice of Hearing against Five Star, and an evidentiary hearing lasting three days was held before an Administrative Law Judge ("ALJ"). On June 23, 2004, the ALJ issued his decision finding, inter alia, that Five Star had violated § 8(a)(1) of the Act with regard to nine of the eleven drivers who were not hired or considered for hire based on their critical letters to the District. The other two drivers were found to have written letters that were not protected by the Act. Five Star filed exceptions, and the General Counsel partial exceptions, to the ALJ's decision, and the case was raised to the NLRB.

A three-member panel of the NLRB reviewed the ALJ's findings and the parties' exceptions and supporting briefs. It divided the eleven drivers into three categories: (1) those whose letters had failed to raise common employment-related concerns; (2) those whose letters primarily raised such concerns; and (3) those whose letters primarily disparaged Five Star. The NLRB concluded that Five Star had violated § 8(a)(1) only as to the six drivers belonging to the second group, because only those drivers' actions were protected by the Act. It ordered these drivers reinstated and granted back pay with interest; the remaining drivers were properly denied employment. See Five Star Transp., Inc., 349 N.L.R.B. No. 8, 2007 WL 185977 (Jan. 22, 2007). Five Star promptly sought judicial review.

## II.  Discussion

### A.  Standard of Review

We review the NLRB's determination that an employer has engaged in an unfair labor practice based on the entirety of the record.  Providence Hosp. v. NLRB, 93 F.3d 1012, 1016 (1st Cir. 1996).  We accord the NLRB's legal findings plenary review, giving due deference to the NLRB's interpretation of the statutes which implicate its area of expertise so long as the interpretation flows rationally from the text of the statute.  Id.; see also NLRB v. Insulfab Plastics, Inc., 789 F.2d 961, 968 (1st Cir. 1986).  The NRLB's factual findings, however, are reviewed under the substantial evidence standard, which is satisfied if the findings are based on "'such relevant evidence as a reasonable mind might accept as adequate to support [the NLRB's] conclusion.'"  NLRB v. Hotel Employees & Rest. Employees Int'l Union Local 26, 446 F.3d 200, 206 (1st Cir. 2006) (quoting McGaw of P.R., Inc. v. NLRB, 135 F.3d 1, 7 (1st Cir. 1997)).

### B.  Violation of § 8(a)(1)[1]

---

[1]  Section 8(a)(1) of the  National Labor Relations Act, 29 U.S.C. § 158(a)(1), establishes that "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in § [7, codified at §] 157 of this title."

Section 7, 29 U.S.C. § 157, in turn reads: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or

For over half a century it has been established that an employer may violate § 8(a) of the National Labor Relations Act through both its hiring and firing practices.  See Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 188 (1941) ("To differentiate between discrimination in denying employment and in terminating it, would be a differentiation not only without substance but in defiance of that against which the prohibition of discrimination [due to union affiliation] is directed."); see also NLRB v. Horizons Hotel Corp., 49 F.3d 795, 805 (1st Cir. 1995) (upholding the NLRB's determination that the employer's refusal to hire predecessor's employees because of their union affiliation violated § 8(a) of the Act).  Five Star argues, however, that its refusal to hire the six letter writers identified by the NLRB ("discriminatees") does not qualify as an unfair labor practice under the Act.  It challenges the NLRB's decision on three grounds: (1) that § 8(a)(1) does not apply to the instant action because no employer-employee relationship existed between Five Star and the six discriminatees; (2) that the letters do not constitute concerted activity; and (3) even if the letters do constitute concerted activity, the Act leaves the discriminatees unprotected because their letters were intended to "sabotage, impugn, and undermine Five Star's reputation and prevent the awarding of the Bus Contract to Five Star."

------

protection . . . ."

## 1.  Employer-Employee Relationship

Five Star's first argument is dismissed in short order. Five Star argues that it could not have violated § 8(a)(1) because this provision applies to conduct by an "employer" against "employees" and, at the time the discriminatees wrote their letters, they were not employed nor had they applied for employment at Five Star.  This contention, however, blatantly disregards the statutory meaning assigned by the Act to the term "employee" which "shall include any employee, <u>and shall not be limited to the employees of a particular employer</u>."  29 U.S.C. § 152(3) (emphasis added).  It is undisputed that the discriminatees were First Student employees when they wrote their letters to the District, and Five Star is certainly an employer.  Thus, the Act's protections apply. <u>See</u> <u>Fabric Servs., Inc.</u>, 190 N.L.R.B. 540, 541-42 (1971) ("[The NLRB] find[s] no basis . . . for construing section 8(a)(1) as safeguarding employees . . . only from infringements at the hands of their own employer. To the contrary, the specific language of the Act clearly manifests a legislative purpose to extend the statutory protection of section 8(a)(1) beyond the immediate employer-employee relationship.").

## 2.  Concerted Activity

Five Star's second argument calls for a slightly more involved analysis, but ultimately it too falls flat.  According to Five Star, the NLRB erred in finding the discriminatees to be

protected by the Act because the letters they sent were not "concerted activity" under § 7, as each one of them was written and sent by an individual driver acting solely on his or her own behalf. Five Star also appears to contend that, because it was unaware that discriminatees' letters had resulted from the January 31, 2003 meeting organized by the Union, the letters cannot be considered concerted activity or a group action.

The "concerted activity" prong of § 7 scrutinizes the manner in which employees raise their common employment-related concerns. Five Star is correct that, generally, an activity is carried out in a "concerted" manner for purposes of § 7 if it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." Meyers Indus., Inc. (Meyers I), 268 N.L.R.B. 493, 497 (1984). Nonetheless, some activities carried out by individual employees may be considered to be concerted. Meyers Indus., Inc. (Meyers II), 281 N.L.R.B. 882, 885 (1986). The critical inquiry is not whether an employee acted individually, but rather whether the employee's actions were in furtherance of a group concern. See id. at 887 ("We reiterate, our definition of concerted activity in Meyers I encompasses . . . individual employees bringing truly group complaints to the attention of management.").

In the case before us, the NLRB found that the six discriminatees raised group complaints; the same complaints, in

-10-

fact, that were aired by members of their Union bargaining unit at the January 31, 2003 meeting led by Union vice-president Clifford. That the discriminatees' letters speak to the same concerns raised at that meeting lends credence to the NLRB's finding that they did not act alone. This conclusion is further reinforced by the fact that two of the six discriminatees also urged the District in their letters to rebid the contract to comport with the conditions of the then-current collective-bargaining agreement, as per the Union's urging. One of the letters even appended a draft resolution on contract specifications to be used in the event of a rebid. Most importantly, it was the Union, at this meeting, who urged that the drivers write to the District detailing their concerns regarding Five Star, and even supplied them with a sample letter and contact information for the District. Given all of these factors, substantial evidence supports the NLRB's finding that the discriminatees' letters constituted concerted activity in furtherance of a truly group concern.

Under Meyers I, an additional requirement for the finding of a § 8(a)(1) violation is that "the employer knew of the concerted nature of the employee's activity." 268 N.L.R.B. at 497. Though Five Star argues that it was not aware of the concerted nature of discriminatees' letters, the evidence on the record adequately rejects this contention. Starting with the January 21, 2003 fax sent by Clifford to Lecrenski, Five Star's president, Five

-11-

Star was on notice that the Belchertown bus drivers were unionized, and that they were seeking a successor collective-bargaining agreement. That same fax also warned that the Union would seek to preserve the conditions of the then-current collective-bargaining agreement "as aggressively as a labor union could be expected to protect the hard-won benefits of its members." Less than a month later, Five Star learned of the fifteen letters written by Belchertown bus drivers to the District, and upon reading them must have gathered that the Belchertown bus drivers were acting as a group to maintain the wages, benefits, and work conditions secured through the then-current collective-bargaining agreement.[2] Taken as a whole, this served to alert Five Star to the fact that these were not individual letters but in fact a letter-writing campaign conducted by the Belchertown bus drivers, possibly associated with the Union, and aimed at preserving the drivers' then-current employment package. As such, Five Star knew of the concerted nature of the drivers' activity, and the NLRB was correct in finding the discriminatees to be preliminarily protected under the Act.

---

[2] All fifteen authors identified themselves as Belchertown bus drivers; all of them enumerated the same work-related concerns regarding wages, benefits, and safety mechanisms such as on-site mechanics; most of the authors made direct reference to the collective-bargaining agreement; and several mentioned the same three safety incidents that had marred Five Star in 1996. Driver Donald Caouette also mentioned in his letter that "[m]any of us discussed not being willing to work" for Five Star.

### 3. Protected Activity

In its sharpest contention, Five Star asserts that even if the discriminatees engaged in concerted activity, they lost the protection otherwise afforded them by the Act because their actions were not part of an ongoing labor dispute, and were otherwise abusive, reckless, and disloyal. As such, and according to Five Star, the NLRB erred in distinguishing the discriminatees' letters from those of the other unprotected drivers because "they contain the same substantial and serious criticism, disparagement, disloyalty, and effort to undermine [Five Star's] standing and keep it from becoming the new bus service contract provider."

It is long established that concerted activity engaged in for sanctioned purposes may lose the veil of protection afforded it by the Act if carried out through abusive means. NLRB v. Local Union No. 1229, Int'l Bhd. of Elec. Workers (Jefferson Standard), 346 U.S. 464, 477-78 (1953) ("Even if the attack were to be treated . . . as a concerted activity . . . within the scope of those mentioned in § 7, the means used by the technicians in conducting the attack have deprived the attackers of the protection of that section."); NLRB v. Circle Bindery, Inc., 536 F.2d 447, 453 (1st Cir. 1976) ("We recognize that even activity otherwise protected under section 7 ceases to be protected if conducted in an excessive or indefensible manner."). Where concerted activity entails communications with a third party, such as here the District, such

-13-

activity is protected if it meets a two-part test:  (1) the communication indicates to the third party that it is related to an ongoing dispute between an employer and employees; and (2) the communication itself is not "so disloyal, reckless or maliciously untrue as to lose the Act's protection."  In re Am. Golf Corp. (Mountain Shadows), 330 N.L.R.B. 1238, 1240 (2000), enforced sub nom. Jensen v. NLRB, 86 Fed. Appx. 305 (9th Cir. 2004); accord Endicott Interconnect Techs., Inc. v. NLRB, 453 F.3d 532, 537 (D.C. Cir. 2006).  The NRLB found this two-part test to be satisfied, and our review finds this holding to be adequately supported by the record.

As to the first part of the Mountain Shadows test, Five Star and the discriminatees were engaged in an ongoing labor dispute.  This is because the Act defines "labor dispute" broadly to include "any controversy concerning terms, tenure or conditions of employment . . . regardless of whether the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 152(9) (emphasis added).  In the instant case, though the discriminatees were not engaged in a direct employer-employee relationship with Five Star, there did exist a controversy between these two parties as to whether the discriminatees would be able to retain their then-current level of wages, benefits, and work conditions should Five Star become their employer under the 2003-2006 bus service contract.  See Local 205, United Elec., Radio &

-14-

<u>Mach. Workers of Am.</u> v. <u>Gen. Elec. Co.</u>, 233 F.2d 85, 90-91 (1st Cir. 1956) (holding that "[a]ny controversy between an employer and a union concerning terms or conditions of employment" is a labor dispute within the meaning of the Act (internal quotation marks and citation omitted)). Though Five Star argues that such a controversy was not ripe because the bus drivers had no evidence to prove that they would not be as well remunerated by Five Star, the NLRB found that the drivers held a reasonable belief that this would be so. The existence of such a belief is supported by the fact that Five Star has a long history as a non-union employer, had already rebuffed the Union's advances to pursue a successor collective-bargaining agreement, and had submitted a bid for the Belchertown bus service contract that was $300,000 lower than the then-current First Student contract, thereby leading the bus drivers to fear that their wages, benefits, and/or work conditions would be adversely affected. As the NLRB's finding is supported by substantial evidence, it is deserving of our deference. <u>See</u> <u>Posadas de P.R. Assocs., Inc.</u> v. <u>NLRB</u>, 243 F.3d 87, 90 (1st Cir. 2001).

Furthermore, though the discriminatees' letters to the District did not use the term "labor dispute," the existence of this controversy was apparent from the text of the discriminatees' letters. All of the letters spoke to the authors' concerns regarding the award of the bus service contract to Five Star and

the expected negative effect this would have on their work conditions. Some of the letters requested that the District rebid the contract to preserve the conditions of the then-current collective-bargaining agreement, and one letter even expressed concern that Five Star was not a union employer. As such, the District was on notice that there existed an ongoing labor dispute between Five Star and the discriminatees, and that the letters were an appeal for support from one of the disputants: the discriminatees. The first part of the Mountain Shadows standard is thus fulfilled. See Endicott Interconnect Techs., Inc., 345 N.L.R.B. No. 28, 2005 WL 2115872 at *4 (Aug. 27, 2005), rev'd on other grounds, 453 F.3d 532 (D.C. Cir. 2006) (finding the first prong of the Mountain Shadows standard fulfilled because the employee's communications to a third party "provide[d] more than enough information for an ordinary reader to understand that a controversy involving employment [was] at issue").

The second part of the standard, that the discriminatees' actions not be excessively disloyal, reckless or maliciously untrue, is also satisfied. It is widely recognized that not all employee activity that prejudices the employer, and which could thus be characterized as disloyal, is denied protection by the Act. Circle Bindery, 536 F.2d at 452 ("[C]oncerted activity that is otherwise proper does not lose its protected status simply because it is prejudicial to the employer."). Indeed, were harm or

-16-

potential harm to the employer to be the determining factor in the Court's § 7 protection analysis, it is doubtful that the legislative purposes of the Act would ever be realized. See Jefferson Standard, 346 U.S. at 479-80 (Frankfurter, J., dissenting) ("Many of the legally recognized tactics and weapons of labor would readily be condemned for 'disloyalty' were they employed between man and man in friendly personal relations."). Instead, we have held that whether concerted employee activity is deemed to be protected depends on whether the employees' actions "appeared necessary to effectuate the employees' lawful aims." NLRB v. Mount Desert Island Hosp., 695 F.2d 634, 640 (1st Cir. 1982); see also NLRB v. Wash. Aluminum Co., 370 U.S. 9, 17 (1962) (distinguishing Jefferson Standard on the ground that the employees in that case were "denied the protection of § 7 . . . because they were found to show a disloyalty to the workers' employer which this Court deemed unnecessary to carry on the workers' legitimate concerted activities").

In this case, the discriminatees' letters to the District were reasonably necessary to carry out their lawful aim of safeguarding their then-current employment conditions. This is because the Union had already contacted Five Star in an effort to be recognized as the drivers' bargaining representative, and Five Star had ignored its advances. This, in conjunction with Five Star's non-union history and its very low bid for the Belchertown

bus service contract, raised an alarm among the Belchertown bus drivers that they might not be able to retain the work conditions they enjoyed under the then-current collective-bargaining agreement. In response to this reasonably perceived threat, the drivers' letter-writing campaign was narrowly tailored to effectuate the drivers' aims: the drivers' letters were addressed solely to the District, not the public at large; the letters only requested that the award of the contract be reconsidered or rebid to preserve the drivers' then-current pay and work conditions; and the discriminatees's letters "concern[ed] primarily working conditions and . . . avoid[ed] needlessly tarnishing [Five Star's] image," Mount Desert Island Hosp., 695 F.2d at 640.[3]

Furthermore, Five Star's contention that the discriminatees' letters are indistinguishable from those sent by their colleagues, which the NLRB deemed unprotected, has one fatal flaw. It is precedent in this circuit that we leave the balancing of countervailing employer and employee interests in the first instance to the NLRB. Circle Bindery, 536 F.2d at 452. This is because we understand the NLRB to have greater expertise in scrutinizing the facts of a case under the labor laws -- especially in a close case such as this one -- so that the legislative purpose behind the laws may be fulfilled. See Harrington v. Chao, 280 F.3d

---

[3] This was not the case with several of the other drivers' letters, which led the NLRB to find that those drivers were not protected by the Act.

-18-

50, 59 (1st Cir. 2002). In this case, the NLRB found the discriminatees to be protected because their letters primarily addressed employment-related concerns and did not disparage Five Star. The NLRB made this finding despite the fact that some of the discriminatee letters also made tangential references to non-employment related concerns such as child safety. Another group of drivers was found to be unprotected, however, because the NLRB read their letters to primarily address those same non-employment related concerns. Based on the reasoning underlying Circle Bindery, however, we "will not reposition a line drawn by the Board between protected and unprotected behavior unless the Board's line is 'illogical or arbitrary.'" NLRB v. Parr Lance Ambulance Serv., 723 F.2d 575, 577 (7th Cir. 1983) (quoting NLRB v. Ben Pekin Corp., 452 F.2d 205, 207 (7th Cir. 1971) (per curiam)); see also NLRB v. Lummus Indus., Inc., 679 F.2d 229, 234 (11th Cir. 1982). Here the NLRB tipped the scale in favor of the discriminatees and such a finding is not arbitrary or illogical, and it is supported by the record. Thus, an assignment of protection is warranted.

### III. Conclusion

For the foregoing reasons, we **deny** Five Star's petition for review and enter judgment **enforcing** the order of the NLRB.

**Enforcement granted**.

-19-