**GEORGE A. HORMEL AND COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 91–1051.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 29, 1991.

Decided May 8, 1992.

David F. Loeffler, Milwaukee, Wis., for petitioner. James W. Cavanaugh, Austin, Minn., also entered an appearance for petitioner.

David A. Seid, Attorney, N.L.R.B., with whom Jerry M. Hunter, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Linda Dreeben, Attorney, Washington, D.C., were on the brief for respondent.

Before D.H. GINSBURG, SENTELLE, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

George A. Hormel & Company fired Robert Langemeier for supporting a consumer boycott of Hormel's products. Langemeier, who denied that he had supported the boycott, complained to the National Labor Relations Board that Hormel fired him for engaging in union activities protected by § 7 of the National Labor Relations Act. The Administrative Law Judge agreed, holding that Hormel committed an unfair labor practice by discharging Langemeier. *Geo. A. Hormel & Co.*, Nos. 17–CA–12789 et al. (ALJ slip op. Apr. 19, 1990). The NLRB affirmed largely upon the basis of the ALJ's opinion. *Geo. A. Hormel & Co.*, 301 N.L.R.B. No. 12 (slip op. Jan. 10, 1991). We conclude as a matter of law that Langemeier engaged in boycott activity unprotected by § 7 of the Act, and we grant Hormel's petition for review.

## I. BACKGROUND

In 1979 Hormel and the United Food and Commercial Workers International Union negotiated a "chain" agreement establishing general conditions of employment at a number of Hormel plants, subject to the negotiation of local supplements and to ratification by the various Union locals. This agreement was in effect until September 1986. When Hormel opened a new facility in Austin, Minnesota in 1982, Hormel and Local P–9 negotiated a separate agreement to cover that plant until August 1985.

In 1984 Hormel exercised its option to reopen the chain agreement in order to bargain for a wage concession. Although there was no parallel wage reopener provision in the separate agreement covering the Austin plant, there was a "me-too" provision, and Hormel maintained that the Company could therefore extend to the Austin plant the wage concession it had negotiated for the other plants. Local P–9 grieved the matter but lost at arbitration.

In order to express his support of Local P–9's resistance to the Company's demand for a wage concession, Robert Langemeier, a 20-year employee at Hormel's Freemont, Nebraska plant and a member of Local 22, put a "P–9 Proud" sticker on his helmet at work. The Personnel Manager at Freemont, Ken Young, ordered Langemeier to remove the sticker, and Langemeier filed a grievance. That was in June 1985.

When the separate agreement covering the Austin plant expired in August of that year, Local P–9 struck, forcing Hormel to close the plant. Local P–9 and its supporters also established informational pickets at other Hormel plants, including Freemont, and organized a national consumer boycott of Hormel's products.

When Local P–9 struck, Langemeier posted on the bulletin board at the Freemont plant a series of informational notices describing the events at Austin. Personnel Manager Young removed each notice shortly after Langemeier posted it, and Langemeier filed another grievance. In December 1985, after noticing that other employees were wearing various stickers on their helmets, Langemeier put another "P–9 Proud" sticker on his helmet. This time Young fired Langemeier for wearing the sticker, and Langemeier grieved again.

Also in December, the International Union recommended that Local P–9 accept Hormel's last offer but the membership of the Local voted to reject it. In January 1986 Hormel reopened the Austin plant and hired permanent replacements for the strikers. In response, Local P–9 set up picket lines at other Hormel plants, including Freemont. A number of employees at the Freemont plant refused to cross Local P–

9's picket line, and they too were permanently replaced. Although the International Union had authorized Local P–9's strike at the Austin plant, it did not authorize the Local to extend the picketing to other plants.

In February 1986 Hormel offered to reinstate Langemeier in order to resolve his discharge grievance. Langemeier accepted reinstatement but informed Personnel Manager Young that he would not return to work while Local P–9 was picketing the Freemont plant. A few days later Young permanently replaced Langemeier for refusing to cross the picket line.

In March the International Union withdrew its authorization of Local P–9's strike at Austin but the Local continued to picket anyway, both at the Austin plant and elsewhere. In May the International placed Local P–9 in trusteeship and ousted its officers. Local P–9 (renamed "Local 9") then removed its picket line at the Freemont plant and Langemeier unconditionally offered to return to work. Hormel duly placed him on the preferential hiring list.

In August 1986 Hormel and the Union negotiated a new chain agreement covering a number of Hormel plants (including Freemont) and a new separate agreement for the Austin plant. Langemeier distributed a leaflet at the Freemont plant urging members of Local 22 to vote against the new chain agreement. The central message of the leaflet was that critical details of the agreement had been concealed from union members. The leaflet also addressed the consumer boycott of Hormel products: Under the heading "Only Complete Job Restoration Through a Fair Contract Will End the Boycott," it stated that "National and local labor unions, religious organizations, Rev. Jesse Jackson, and state Democratic Party platforms—to name a few— have pledged to support the boycott until all jobs are restored."

All the locals ratified the chain agreement, and Local 9 ratified the separate agreement for the Austin plant. Hormel and Local 9 signed the Austin agreement in October and in November reached a supplemental agreement settling the strike. Although a dissident group of Local 9 members continued to demand reinstatement of the strikers and advocated using the consumer boycott to that end, under the settled principle of majority rule in labor law, *see Emporium Capwell Co. v. Western Addition Community Org.*, 420 U.S. 50, 61–64, 95 S.Ct. 977, 984–85, 43 L.Ed.2d 12 (1975), Local 9's approval of the new agreement and the strike settlement officially ended the labor dispute at the Austin plant.

Thereafter Langemeier remained on the preferential hiring list. Meanwhile, in late September 1986 he traveled to Great Britain along with other representatives of organized labor to demonstrate support for Britain's striking coal miners. In the course of their visit, several individual members of the group, not including Langemeier, publicly advocated extending the consumer boycott of Hormel's products to Great Britain.

In March 1987 Langemeier participated in a parade and rally in Austin. According to a promotional flyer, the purpose of the event was to "TURN UP THE HEAT ON HORMEL" and to "kickoff" the "National Boycott" of Hormel products (which was in fact already underway). Many of the vehicles in the parade displayed banners or stickers supporting the boycott, and many of the people who attended the rally held signs or wore t-shirts with messages supporting the boycott. The speakers at the rally, who appeared on the dais in front of a large "BOYCOTT HORMEL" banner, all expressed their support for the dissidents of former Local P–9 and called upon organized labor to unite against wage concessions; most spoke in support of the boycott as well.

Langemeier drove his truck in the parade and attended the rally, but he did not carry a sign, wear a t-shirt or button, or otherwise express a position for or against the boycott. Nor did he speak at the rally. Three of the speakers acknowledged from the podium Langemeier's presence in the audience—one even referred to him generally as an inspiration for others—but none said anything specifically to associate him with the boycott.

Upon Langemeier's return to Freemont, Personnel Manager Young called him in for a disciplinary hearing. At the hearing Young presented evidence linking Langemeier to the boycott. Although Langemeier denied supporting the boycott, Young discharged him.

Later that day Langemeier and his wife were seen in a grocery store in Freemont. According to an eyewitness, one of the Langemeiers—he could not be sure which—placed a "Boycott Hormel Products" sticker in front of some Hormel products. At a meeting of Local 22 a couple of weeks later, Langemeier criticized a union official for wearing a t-shirt advertising Spam, which is a Hormel product. Langemeier told the official that Spam "can kill people" and gave him a leaflet entitled "Spam Scam" claiming that the product poses "serious health hazards" to consumers.

Langemeier filed a complaint with the NLRB, claiming that Hormel had committed an unfair labor practice by discharging him for engaging in activity protected by § 7 of the NLRA, *viz.* leafletting in opposition to the 1986 chain agreement, travelling to Great Britain with labor leaders, and attending the Austin rally. Hormel responded that it fired Langemeier solely for participating in unprotected activity, *viz.* advocating the consumer boycott of Hormel products. The ALJ and the Board concluded that Langemeier did not support the boycott; therefore, despite the employer's good faith belief that Langemeier was a boycotter, Hormel had committed an unfair labor practice by discharging him. The Board ordered Hormel to reinstate Langemeier with back pay. Hormel petitioned this court for review, and the NLRB cross-petitioned for enforcement.

## II. ANALYSIS

Section 7 of the NLRA protects the right of employees "to engage in ... concerted activities for the purpose of ... mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice "for an employer ... to interfere with, restrain, or coerce employees in the exer-

cise of the rights guaranteed in section 7" of the Act. *Id.* § 158(a)(1). Nothing in the Act prevents an employer from disciplining or discharging an employee for disloyalty, however. *See* NLRA § 10(c), 29 U.S.C. § 160(c) ("No order of the Board shall [provide relief to] an employee ... suspended or discharged for cause"); *NLRB v. Local Union No. 1229, IBEW (Jefferson Standard Broadcasting Co.)*, 346 U.S. 464, 472, 74 S.Ct. 172, 176, 98 L.Ed. 195 (1953) ("There is no more elemental cause for discharge of an employee than disloyalty to his employer").

██ As a rule, an employee who supports a boycott of his employer's product violates his duty of loyalty to the employer. *See, e.g., id.* at 472–77, 74 S.Ct. at 176–79; *Sahara Datsun*, 278 N.L.R.B. 1044, 1046 (1986); *Patterson–Sargent Co.*, 115 N.L.R.B. 1627, 1630 (1956). There is an exception to that rule, however: supporting a boycott is protected § 7 activity if it (1) is related to an ongoing labor dispute and (2) does not disparage the employer's product. *See, e.g., Sierra Publishing Co. v. NLRB*, 889 F.2d 210, 216 (9th Cir.1989); *Coors Container Co. v. NLRB*, 628 F.2d 1283, 1287 (10th Cir.1980); *Community Hosp. v. NLRB*, 538 F.2d 607, 610 (4th Cir.1976); *Emarco, Inc.*, 284 N.L.R.B. 832, 833 (1987); *Allied Aviation Serv. Co.*, 248 N.L.R.B. 229, 230, *enf'd* 636 F.2d 1210 (3d Cir.1980).

This case turns upon the question whether the Board properly determined that Robert Langemeier did not support the consumer boycott of Hormel products after the end of the labor dispute between Local 9 and Hormel at the Austin plant. If he did not, then, as the Board held, Hormel committed an unfair labor practice by discharging him. *Cf. NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1 (1964) (employer's good faith belief that employee engaged in misconduct unprotected by § 7 is not a defense to § 8(a)(1) charge but does shift burden of proof to General Counsel). If he did, then his actions were not protected by § 7 and Hormel lawfully discharged him.

██ The Board concluded that Langemeier did not support the boycott based upon

its examination of his subjective intent. *See, e.g.,* ALJ slip op. at 69 (evaluating Hormel's evidence of "Langemeier's actual boycott motivation"); *id.* at 70 (evidence regarding September 4 leafletting "is at best ambiguous on the point that Langemeier ... actually was personally motivated to support or encourage a boycott of Hormel [p]roducts"); *id.* at 77 (evidence did not show that Langemeier's attendance at the Austin rally was "conduct ... motivated ... to actually encourage or support a boycott"); *id.* at 78 ("the evidence is actually very weak that Langemeier ever personally embraced a boycott"). By demanding evidence of Langemeier's subjective intent, the Board in effect said, albeit none too precisely, what it means to "support" a boycott in the context of the NLRA. Under *Chevron v. NRDC,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), we must accept the Board's position unless it conflicts with the "unambiguously expressed intent" of the Congress or is not "a permissible construction of the statute."

There is no conflict between the Board's subjective test and any "unambiguously expressed" intent of the Congress. Nothing in the text or the legislative history of the NLRA addresses the specific question of the test the Board should use to define the contours of an employee's duty of loyalty.

The Board's subjective approach does not, however, entail a "permissible construction" of the NLRA because it is inconsistent with the statutory policy of preserving the employer's right to discharge an employee for disloyalty. Consider, for example, the case of an employee who wears in public a t-shirt advocating a boycott of his employer: asked why, he says (truthfully) that he wears it because he likes the colors, or because his wife designed it, or because all of his buddies from work are wearing similar t-shirts on their off-hours. Whatever his reason, that employee is unquestionably promoting the boycott. Anyone who sees him gets that message. Yet under the Board's subjective test, the employer could not lawfully discharge him without showing also, as the ALJ put it, that the employee's "conduct ... was ... motivated ... to actually encourage or support a boycott." ALJ slip op. at 77. Because extending protection to such conduct would so circumscribe as to defeat the employer's right to discharge an employee who is working against the employer's business interest, we conclude that a subjective test is inconsistent with the Act. Rather, the Act requires an objective test of disloyalty. *Cf.* Oliver Wendell Holmes, Jr., *The Common Law* 54 (M. Howe ed. 1963) ("Acts should be judged by their tendency under the known circumstances, not by the actual intent which accompanies them").

◼ In an effort to show that Langemeier worked against his employer's business interest, Hormel relies upon five events, jointly and severally: (1) Langemeier handed out a pro-boycott leaflet in September 1986. (2) Later that same month he travelled to the United Kingdom with other unionists, where some of them spoke in favor of extending the boycott. (3) He participated in the March 1987 pro-boycott parade and rally in Austin. (4) Langemeier or his wife placed a "Boycott Hormel" sticker on a grocery store shelf in May 1987. And (5) the next month he told a union official that Spam "can kill people" and handed him a leaflet charging that the product poses "serious health hazards." The first two of these episodes arose out of the ongoing labor dispute at the Austin plant; thus, even if they constitute support for the boycott, § 7 protects Langemeier from discharge on that account.

We turn to the third event, the parade and rally at Austin. The immediate purpose of such a parade or rally is to affirm the justness of, and publicly to show support for, a cause; the ultimate purpose is to build additional support for that cause. The cause being advanced by the display of solidarity at Austin was unquestionably the boycott of Hormel products. Most of the speakers at the rally expressly urged the public to boycott Hormel, and all of the speakers appeared in front of a large "BOYCOTT HORMEL" banner. (Although the ALJ stated that the parade and rally advanced ends in addition to promoting the boycott—supporting the P-9 dissidents and opposing wage concessions, *see* ALJ slip op. at 43–44, 73—those are but

restatements of a single end expressed at different levels of generality.)

Langemeier drove his truck in the parade leading to the rally. He attended the rally but he did not address the crowd nor, as the ALJ noted, did he carry a sign, wear a button, or otherwise express in words his support for the boycott. *Id.* at 44, 56, 74. Thus, the issue boils down to whether, as a matter of law, Langemeier violated his duty of loyalty to Hormel by driving in the parade and participating in the rally.

By participating in the Austin boycott parade and rally, Langemeier clearly communicated to every observer that he was a member of the group supporting the boycott. To anyone who knew of his employee status, Langemeier's presence may have been especially compelling testimony; but even to one who did not know that he was a Hormel employee, his presence swelled the ranks of those visibly supporting the boycott. In that way did he work against his employer's interest in violation of his duty of loyalty.

Perhaps an employee could have attended the rally—and maybe even have driven in the parade—without advancing the boycott (*e.g.*, by displaying a sign that says, "I support the dissidents of Local P–9 but oppose the boycott"). Langemeier did not, however, show that he took steps sufficient to limit the inference reasonably to be drawn from his participation in the parade and rally—although he had every incentive to make that showing, if he could, regardless whether his conduct was to be evaluated by an objective or a subjective standard.

Based upon the record before us—including a video tape of the parade and rally, which we have viewed—we conclude that any reasonable observer of these events would have to infer that Langemeier, by driving in the parade and attending the rally to which it led, acted in furtherance of the boycott. As a result, whatever Langemeier believed in his heart of hearts, he violated his duty of loyalty to Hormel, which committed no unfair labor practice by discharging him. Because there is not substantial evidence in the record to support the Board's conclusion to the contrary, *see Universal Camera Corp. v. NLRB*, 340

U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)), a remand for the Board to apply the correct legal standard would be an empty gesture, *see NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766–67 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709 (1969).

### III. CONCLUSION

In view of our conclusion regarding Langemeier's participation in the parade and rally, we have no occasion to pass upon the other two incidents to which Hormel points in order to establish that Langemeier supported the boycott of its products. Nor need we reach Hormel's claims that the ALJ failed to consider certain circumstantial evidence and improperly shifted the burden of proof from the General Counsel to the Company. For the reasons stated in Part II, we grant Hormel's petition for review and deny the NLRB's cross-petition for enforcement.

*So Ordered.*