BROWN, Circuit Judge,
dissenting:
Twenty-six technicians objected to their employer’s new, exacting compensation terms. When them employer refused to relent, they pitched their story to a local news station’s consumer watchdog reporter. These employees then appeared on television in an effort to curry public sympathy for their demands. So far, no problem. The NLRA has always blessed organized efforts like these aimed at gaining advantage in a labor dispute.
But when these technicians falsely accused their employer during a television broadcast of certain outrageous business practices, they crossed a line — from labor dispute to public disparagement; from concern about wages and working conditions to a vendetta aimed at undermining the Companies’ reputation. True, the NLRA aggressively protects organizing efforts, but the core of the Act is the balance it strikes between employees’ and employers’ legitimate, conflicting interests. There are limits to how far employees may go in pursuit of bargaining advantage. Those who work within these limits are protected, but those who ignore them, who pursue their ends through inappropriate means, are stripped of the Act’s protections.
This is not a close case. Had the MasTec technicians honestly and fairly discussed their labor dispute with the news station, their aggressive tactics could be sustained as a proper appeal to outside parties. See Eastex, Inc. v. NLRB, 437 U.S. 556, 565, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978). But these technicians chose instead to feed the station a false, disparaging story they knew would trigger public outrage. The two most damning lies they told the viewers of WKMG-TV Channel 6 were that their employer (1) required them to lie (it did not), and (2) seriously encouraged them to scare customers into accepting an unnecessary — and excessively expensive— service by warning that the product would “blow up.” To be sure, a MasTec supervisor did jokingly suggest that, but everyone present understood it to be in jest. By soberly repeating that joke to a public audience without its context and as though it were a serious instruction, these technicians left, the NLRA and its protections behind. As “[tjhere is no more elemental cause for discharge of an employee than disloyalty to his employer,” NLRB v. Local Union No. 1229, Int’l Broth. of Elec. Workers, 346 U.S. 464, 472, 74 S.Ct. 172, 98 L.Ed. 195 (1953) (Jefferson Standard), I can’t blame MasTec for showing them the door. And frankly, neither can the NLRA.
It’s not hard to see why the technicians resorted to these manipulative gambits: an ordinary labor dispute would not be newsworthy, but tales of corporate perfidy and consumer fraud would undoubtedly pique the interest of Channel 6 and the viewing public. Still, self-interest does not excuse mendacity, and MasTec acted well within its rights when it fired these disloyal technicians.
⅜ ⅝ ⅜
Of course, as I write in dissent, I’m alone in my view of this case. The court upholds the Board’s determination that the NLRA requires employers to suffer insubordination and damaging falsehoods in silence unless they can prove the-employees’ vindictive mental state. “Common sense *47 sometimes matters in resolving legal disputes.” Southern New England Telephone Co. v. NLRB, 793 F.3d 93, 94 (D.C. Cir. 2015). Here, however, neither common sense nor the ordinary rules of statutory construction are in evidence — a lacuna that indicts the unconstitutionally generous standards of review through which federal courts routinely cede statutory interpretation to biased administrative tribunals. This case, for example, demonstrates the lengths to which the Board will go to contort an evenhanded Act into an anti-employer manifesto. Instead of attempting to balance conflicting interests, the NLRB reacts like a pinball machine stuck on tilt; reflexively ensuring employers always lose a turn.[1]
I.
The NLRA prohibits employers from discharging employees for engaging in certain kinds of protected conduct. See 29 U.S.C. § 157 (“Employees shall have the right to self-organization, to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection_”). This provision doesn’t lend employees unconditional cover, however. Instead, they are only protected to the extent their conduct is (1) “related to an ongoing [labor] dispute” and (2) “not so disloyal, reckless, or maliciously untrue as to lose the Act’s protection.” In re American Golf Corp., 330 NLRB 1238, 1240 (2000); see also Jefferson Standard, 346 U.S. at 477, 74 S.Ct. 172. This has been the Board’s rule for dischargeable disloyalty — until today.
Much like the NLRA itself, this rule mediates the conflicting rights of employers and employees. On one hand, “there is no more elemental cause for discharge of an employee than disloyalty to his employer.” Id. at 472, 74 S.Ct. 172; see also 29 U.S.C. § 160(c) (“No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.”). On the other, employees enjoy a right to engage in concerted activity, which can include public criticism of an employer’s labor policies. When employees are fired for their conduct during a labor dispute, a “difficulty arises.” Jefferson Standard, 346 U.S. at 475, 74 S.Ct. 172. Were they fired for disloyalty, or for protected conduct their employer happened to dislike? This case involves precisely that difficulty.
Because in my view the technicians seized a public opportunity to sharply attack the Companies’ business policies and harm their reputation with false statements, I would grant the Companies’ petition. The Board’s two determinations— that the technicians’ actions and statements were not “so disloyal” or “maliciously untrue” — violated circuit precedent and were unsupported by substantial evidence. More fundamentally, the frameworks un *48 derpinning both of the Board’s determinations are themselves unfaithful to the NLRA and Supreme Court precedent.
A.
The court majority upholds a Board determination that excused a series of disparaging, false remarks several employees made during a television broadcast to a journalist whose only interest was in exposing .and publicizing corporate wrongdoing harmful to consumers. In reaching that conclusion, the Board ignored binding circuit precedent; by accepting the Board’s action,.the majority eviscerates that precedent. But, we are not the only court to have construed the NLRA, Even if the Board could excuse, itself from our precedents (an option I do n.ot concede) and a panel of this court could rewrite an inconvenient case (an alternative ordinarily available only with the acquiescence of the full court), the text of the NLRA and the Supreme Court’s interpretation of it still preclude the Board’s result..
1.
Our controlling decision in George A. Hormel & Co. v. NLRB, 962 F.2d 1061, 1065 (D.C. Cir, 1992), requires we grant the Companies’ petition. To see why, let’s examine what the Board determined. As to whether the technicians’ conduct was sufficiently disloyal to lose NLRA protection, the Board concluded:
“While the technicians may have been aware that some consumers might cancel the [Companies’] services after listening to the newscast, there is no evidence that they intended to inflict such ' harm on the [Companies] or that they acted recklessly without regard for the financial consequences to the [Companies’] businesses. We therefore find that the technicians did not engage in unprotected disloyal or reckless conduct.”
Mastec Advanced Techs, 357 NLRB 103, 108 (2011) (emphasis added). Note this paragraph’s animating logic: because there was no evidence of intent to harm their employer, the employees’ harmful statements- were not sufficiently disloyal. There’s one small problem with this subjective approach to disloyalty: we expressly — rand unequivocally — rejected it. See Hormel, 962 F.2d at 1065.
In Hormel, an employee was fired for attending a rally supporting a boycott of his employer. The Board purported to examine the employee’s subjective intent and concluded he did not intend any disloyalty. We reversed. Differing views on the relevance of employee intent accounted for these opposing conclusions. The Board required the employer to show it reasonably believed (from the “ostensible evidence”) that the employee “personally embraced” the boycott. See George A. Hormel & Co. and Robert W. Langemeier United Food and Commercial Workers International Union, Local Union No. 22, 301 NLRB 47, 87 (1991). We disagreed, explaining such a “subjective test” couldn’t be squared with the NLRA’s “statutory policy of preserving the employer’s right to discharge an employee for disloyalty,” Hormel, 962 F.2d at 1065. The question should have been whether “any reasonable observer” would infer the employee acted in furtherance of disloyal behavior (the boycott), not whether the employee intended to be disloyal. Id. at 1066.
Hormel’s holding was quite clear: the NLRA “requires an objective .test of disloyalty.” Id. at 1065 (emphasis added). In our view,' requiring employers to ' assess intent “would so circumscribe as to defeat the employer’s right to discharge an employee who is working against the employer’s business interest.” Id. An employee may wear a pro-boycott t-shirt because he “likes the colors” or to fit in with friends, *49 but “[w]hatever his reason, that employee is unquestionably promoting the boycott. Anyone who sees him gets that message.” Id. The employer has a right to fire that disloyal employee no matter what he intended, but “under the Board’s subjective test, the employer could not lawfully discharge him without showing” the employee wore the shirt “to actually encourage or support the boycott.” Id.
Today’s majority excuses the Board’s obvious circumvention of Hormel, rather than apply its clear holding. According to the Board, what protected these technicians wasn’t a lack of evidence that they disparaged the companies, but a lack of evidence they intended to do so. See Mastec, 357 NLRB at 108. This decision is identical to the analysis reversed in Hormel, requiring employers to assess intent before punishing objectively disloyal behavior. That approach violates the NLRA. 962,F.2d at 1065.
The court’s rewriting of Hormel renders this once-vibrant precedent a mere rain shadow to the mountain the majority would have employers climb. The majority rescues the Board by distinguishing Hormel in two ways, one irrelevant and the other incorrect.
First, the majority insists Hormel “addressed a different question than the one at issue here;” Op. 38, that is, addressing the propriety of subjective tests only as to whether an act of disloyalty occurred, not as to whether that act was “flagrantly disloyal.” Id. Consequently, the majority claims Hormel poses no obstacle to considering “an employee’s [subjective] intentions” to “shed meaningful light on” “the degree and nature of his disloyalty,” i,e., to determine “flagrant” disloyalty. Op. 39. The result is unintelligible. Hormel now precludes reliance oh the employee’s subjective intent to determine .whether: the employee’s conduct was disloyal, but permits the employee’s subjective intent' to determine the “degree and nature” of disloyalty. Tellingly, the majority attempts to reassure us Hormel retains precedential value — to its own facts. See Op. 39 (“That is a meaningful limitation [on the use of subjective intent], especially in circumstances like those in Hormel
The majority is of course correct that the specific question in Hormel (“did he do it?”) is different from the one at issue here (“was it flagrantly disloyal?”). But, remember, Hormel rejected the subjective approach in order to vindicate “the statutory policy of preserving the employer’s right to discharge an employee for disloyalty,” 962 F.2d at 1065, a right the Supreme Court described as “elemental” and “plain,” Jefferson Standard, 346 U.S. at 472, 475, 74 S.Ct. 172. How can a statutory policy be threatened by the use of subjective' intent to determine disloyal conduct, but not be threatened by using subjective intent to determine the “degree” of disloyalty? How can an employer’s right to discharge for disloyalty be “elemental” and “plain” when it hinges on an employee’s subjective intent? The answer is self-evident: It cannot. Only by adding an unwarranted gloss to the meaning of disloyalty and subtracting from the law as articulated by the Court can the majority fashion its purported distinction. This is revealed in the majority’s sub si-lentio reversal of Hormel’s holding that the disloyalty inquiry is “a matter of law.” Compare 962 F.2d at 1066 with Op. 40 (“The question of whether employee conduct is so disloyal as to fall outside the Act’s protection is an inherently fact-intensive, context-dependent one.”). Such an outcome does a disservice to the rule of law. Hormel’s broad rationale vindicated a clear statutory policy against using subjective intent to determine disloyal behavior. Its logic applies with equal force to *50 preclude subjective intent from determining the degree of disloyalty. And it must, otherwise its insistence on an objective test would be pointless.
Second, the majority incorrectly argues it was the Board’s reliance on subjective evidence of intent that offended the Hormel court, rather than reliance on intent altogether. To the court majority, Hormel prohibits measuring employee^ intent by reference to a purely subjective standard (what’s in the employee’s “heart of hearts”), but not through objective evidence. Op. 39. Because the Board used subjective intent to “shed meaningful light on” “the degree and nature of his disloyalty,” Op. 39, the court majority believes the Board’s analysis was consistent with Hormel, which the majority characterizes as “establishing] that an employee of course cannot disclaim an action that rings out as disloyal to all the world by contending that he in fact did not intend to act disloyally.” Op. 38-39.[2]
But, Hormel cannot be read, as the majority does, to permit consideration of employee intent through objective evidence. Hormel reversed a Board decision that took precisely that approach. See 301 NLRB at 87 (finding a lack of “any ostensible evidence of their support of a boycott”) (emphasis added). The Hormel ALJ gauged the employee’s “actual boycott motivation” (intent) by marshalling a litany of objective evidence on both sides, see id. at 84, which was adopted in full by the Board, along with the rest of the ALJ’s recommended Order. Our opinion in Hormel recited the ALJ’s consideration of this evidence. See 962 F.2d at 1065-66. Based on these objective indicia of intent, the ALJ concluded “the evidence is actually very weak that [the employee] ever personally embraced a boycott.”[3] 301 NLRB at 87. Put differently, the evidence didn’t show the employee intended to disparage Hormel, and thus his discharge was unlawful. We rejected that conclusion. To us, the mere fact of the employee’s presence at the boycott was enough to justify his termination.
Significantly, the Hormel court didn’t reverse merely because it disagreed with the Board’s weighing of competing indicia of intent, a result that would have justified the majority’s view that Hormel blessed examination of intent through objective evidence. If so, we simply could have said the Board downplayed what we saw as the most obvious indicia of intent: Langemeier’s presence at the rally. No, our rationale was more fundamental. We rejected the Board’s entire approach, concluding it was not “a permissible construction of the NLRA” because it “circumscribe[d]” the employer’s right to fire disloyal employees. Hormel, 962 F.2d at 1065; see also id. (“The Board’s subjective approach does not, however, entail a permissible construction of the NLRA because it is inconsistent with the statutory policy of preserving the employer’s right to discharge an employee for disloyalty.”). Where the Board sought objective evidence of intent, *51 we sought objective evidence of disparagement. Intent was irrelevant. All that mattered was that the employee attended the boycott (without expressly disclaiming support for it). The discharge was lawful because “any reasonable observer would have to infer” that conduct furthered a disloyal action (the boycott). Id. at 1066. It did not matter why Langemeier participated; only that he did in fact participate.[4]
Thus, the Mastec Board’s opinion is virtually indistinguishable from the one we reversed in Hormel. Just as the Board claims it relied on “objective criteria” to gauge whether MasTec technicians “intended to inflict ... harm” on the companies or “withheld information in order to mislead the viewing public,” the Hormel ALJ sought to gauge the employee’s “actual boycott motivation” by examining “ostensible evidence.” In each case, the Board found the termination unlawful due to a lack of evidence that the employees intended to disparage or harm their employers. Assuring us that its examination drew on objective rather than subjective indicia doesn’t magically sanitize an inquiry that should 'have disregarded intent in the first place. No matter how objective the indicia, they are by the Board’s admission still probative of the technicians’ subjective intent. That inquiry is, according to our binding opinion in Hormel, barred by the NLRA.
By dismissing Hormel based on irrelevant and incorrect distinctions, the majority has, inappropriately, confined Hormel to its specific facts, and severely weakened the important protections afforded to employers through the second prong of the Jefferson Stodard-inspired test. Unfortunately, sacrificing circuit precedent is not enough to save the Board’s result — the majority must also ensure that not even the Supreme Court is allowed to stand in the way of the Fourth Branch.
Nothing in Jefferson Standard supports an analysis of “flagrant” disloyalty contingent upon subjective intent. Indeed, nothing in Jefferson Standard suggests terminable disloyalty must be “flagrant.” Yet, the majority gives Jefferson Standard a dress-down similar to the one Hormel received: death by incorrect and irrelevant distinction.
First, the incorrect distinction: After citing the two-part test for dischargeable disloyalty inspired by Jefferson Standard (protecting employees from discharge when their conduct is (1) related to an ongoing labor dispute and (2) not sufficiently disloyal), the majority claims Jefferson Standard is in “contrast” with this case because it only dealt with the first prong. Op. 35 (“In Jefferson Standard, the handbill in question fell outside the Act’s protection because it simply attacked the quality of the company’s product without indicating ,any connection to the ongoing employment controversy.”). This is mistaken.
Jefferson Standard “agree[d]” the employees did not satisfy the second prong. See 346 U.S. at 472, 74 S.Ct. 172 (“[T]he handbill [w]as a demonstration of such detrimental disloyalty as to provide ‘cause’ for” termination). Still, the majority insists “Jefferson Standard had no occasion to address the [second prong].” Op. 35. But not only did Jefferson Standard have “occasion” to address the second prong (see above), it said the employees’ disloyalty rendered irrelevant any satisfaction of the first prong. See 346 U.S. at 477-78, 74 S.Ct. 172 (“Even if the attack were to be *52 treated, as the Board has not treated it, as a concerted activity wholly or partly within the scope of those mentioned within § 7 [of the NLRA], the means used by the technicians in conducting the attack have deprived the attackers of the protection of that section, when read in the light and context of the purpose of the Act”) (emphasis added). The majority “reads that sentence to pertain to the first-step inquiry, not the second step.” Op. 35. By this, I take the majority to mean, since the handbill failed to “indicate a connection to an ongoing labor dispute ... the handbill ... would have been deemed unprotected [by the Court] even if the Board had found otherwise,” id (emphasis omitted). This makes no sense/ If the handbill did not “indicate a connection” to the ongoing labor dispute, then how could the Board have possibly concluded it satisfied the first prong? The majority provides no answer.
The logical conclusions from Jefferson Standard are: (1) the handbill was sufficiently disloyal to merit termination; (2) the Board did not decide whether satisfying the first prong would affect the employer’s right to terminate; and (3) even if the Board found the first prong satisfied, the “means,” i.e., the handbill’s disparaging contents, were sufficiently disloyal to merit termination. Sadly, none of these conclusions are clear after today’s decision (tellingly, the majority cites the Board’s subsequent precedent to justify its reading, not Jefferson Standard, see Op. 35).
The framework endorsed by the incorrect distinctions with Jefferson Standard and Hormel makes it impossible for disloyal and disparaging employee behavior to be the basis for termination, so long as it is connected to an ongoing labor dispute. Indeed, in endorsing the Board’s examination of the technicians’ subjective intent, the majority goes so far as to accept the “relation]” itself as valid evidence undermining any finding of disloyalty.[5] See Op. 36-37, 33-34. Going forward, it is difficult to see how employee behavior could satisfy the test’s first prong and nonetheless still fail the second. This is the paradigmatic case, but the court sides with the employees anyway.
2.
Now, the majority’s irrelevant distinction with Jefferson Standard: The court accepts the Board’s rule that only “flagrantly disloyal” and “wholly incommensurate” behavior is , unprotected. The majority claims this rule follows from Jefferson Standard. In reality, however, the majority transforms the recounting of terminable disloyalty in some cases into a requirement for terminable disloyalty in all cases.[6] The *53 net result is an artificial narrowing of terminable disloyalty.
Even before the pro-employer Taffc-Hartley amendments were added to the NLRA, the Supreme Court recognized the Act protected an employer’s right of discharge. Writing for the Court in 1937, Chief Justice Hughes admonished the Board not to use its authority as “a pretext for interference with the right of discharge when that right is exercised for other reasons than [] intimidation and coercion.” NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Quoting this language, the Jefferson Standard Court declared that the principle that “disloyalty is adequate cause for discharge is plain enough,” 346 U.S. at 475, 74 S.Ct. 172, and that “[tjhere is no more elemental cause for discharge ... than disloyalty,” id. at 472, 74 S.Ct. 172.[7] That right doesn’t dissolve as soon as a labor dispute arises. See id. at 477-78, 74 S.Ct. 172 (“Even if the attack were to be treated ... as a concerted activity ... the means used ... have deprived the attackers of the protection of [the Act].”). Employees may engage in concerted activity; however, the NLRA doesn’t immunize disloyal behavior. But see Op. 36. Jefferson Standard itself confirms this point. When commenting that the nature of the employees’ disloyalty would be terminable even if it were connected to an ongoing labor dispute, the Court cites a wide range of behavior. See 346 U.S. at 478 n.13, 74 S.Ct. 172. From assault to failing to make deliveries to avoid crossing a picket line, see id. the varying forms of disloyalty cited by Jefferson Standard debunk the notion that only “flagrant’! disloyalty can trigger the “plain” right of discharge.[8]
But, something very strange happened after Jefferson Standard. The Board gradually weakened the very right the Court went out of its way to vindicate. Presently, employers may only fire “flagrantly disloyal” employees whose behavior is “wholly incommensurate with any grievances they might have.” See Mastec, 357 NLRB at 108 (emphasis added). Anything .less than flagrant disloyalty must be taken on the chin.
This rule is “wholly incompatible” with Jefferson Standard’s insistence that an employer’s right to fire disloyal employees is “elemental” and “plain.” Twenty-two *54 years after Jefferson Standard, the gloss that would ultimately swallow the plain text made its first appearance — not as a rule, but as a description of a specific employee’s conduct toward his employer. Firehouse Restaurant, 220 NLRB 818, 825 (1975). Three years later, the language reappeared, again not as a rule but this time as an observation about the kinds of cases in which the Board had found concerted but disloyal activity lost NLRA protection. See Veeder-Root Co., 237 NLRB 1175, 1177 (1978) (observing that in cases of flagrant, wholly incommensurate disloyalty, “the Board has held disciplinary action to be' justified”). The language was more explicitly adopted as a guiding standard one year later in Richboro Community Mental Health Council, when the Board rejected an employer’s disloyalty argument for not meeting the historical standard described in Veeder-Root. 242 NLRB 1267, 1267-68 (1979) (holding that while “flagrantly disloyal, wholly incommensurate” conduct can forfeit NLRA protection, “such is hardly the case here”). From description to observation to standard, the Board slowly, surely chipped away at a right of employers the Supreme Court had made a deliberate effort to protect.
Finally,' in the decision we’re reviewing today, the Board’s gradual, decades-long evisceration of the employer’s discharge right culminated in its strongest invocation of this language yet. For the first time, the Board made its requirement of flagrant and wholly incommensurate disloyalty explicit by framing it in conditional terms: “The Board has stated that it will not find a public statement unprotected unless it is ‘flagrantly disloyal, wholly incommensurate with any grievances which they might have.’ ” Mastec, 357 NLRB at 108.[9]
What we are confronted with, then, are two incompatible propositions. On the one hand, the Supreme Court insists that an employer’s right to discharge an employee for acts of disloyalty is “elemental” and “plain enough.” On the other, the NLRB cautions that where concerted activity is concerned, the employers’ right extends only to acts of flagrant disloyalty. The NLRB’s modifier is wholly absent from, and incompatible with, Jefferson Standard. ■While I recognize the Board’s special authority to “appl[y] the general provisions of the Act to the complexities of industrial life,” NLRB v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), that authority should not permit it to erode Supreme Court precedent — especially when that precedent interprets the agency’s authorizing statutes.
B.
The majority also upholds the Board’s determination that the technicians’ statements were not “maliciously untrue.” The “maliciously untrue” standard is another invention of the Board, designed especially to deal with a particular subspecies of disloyalty: false statements. Under this standard, false statements are unprotected if “made with knowledge of their falsity or with reckless disregard for their truth or falsity.” Mastec, 357 NLRB at 107.
*55 The Companies charge the technicians with conveying at least three maliciously untrue sentiments: (1) the technicians were required to lie; (2) they were seriously encouraged to tell customers their receivers would “blow up” if not connected; and (3) customers are charged per connection. The Board rejected the Companies’ claims, and the majority now concludes substantial evidence supported that determination.
I disagree. In my view, the Board’s determinations with respect to at least the first two sets of statements are unsupported by substantial evidence.
1.
In their interview, the technicians falsely stated they were required to lie to customers. One technician said,.“If we don’t lie to the customers, we get back charged for it.” Following the reporter’s observation that “It’s either lie or lose money,” another said, “We don’t have a choice.” Even if one accepts the court’s conclusion that the technicians were “essentially told to lie,” that fact does not justify their additional assertions either that they had ho “choice” but to lie or that if they didn’t “lie to the customers [they’d] get back' charged for it.” The technicians who made this assertion knew it was false, their response validated the reporter’s characterization— “[i]t’s either lie or lose money” — and it unquestionably disparaged the reputation of the Companies.
The key fact, that at no point in any of the training did MasTec threaten back charges for technicians who refused to lie, is one the technicians must have known. That, of course, would have been absurd. It is not “lying” that triggers back charges, but rather the failure to convince a customer to connect, Even if lying might be one way to sell a connection, it is obviously not the only way. An improved sales pitch alone could do the trick. After all, customers receive certain benefits from connecting, such as remote control pay-per-view, caller-ID integration, and access to system updates.
Sure, as the majority suggests, had the technicians explained that getting a 50% connection rate is difficult and that sometimes they felt as though lying was the only way to avoid back charges, this would be a. very different story. That (truthful) description would have fairly and still sympathetically illuminated the nature of their grievance, which was that complying with MasTec’s policies was so difficult that lying seemed an inescapable temptation, one MasTec even encouraged. But what they actually said paints a far more, damning picture of the Companies. The fact that they chose to tell a blatant lie, particularly where the truth was more than adequate to the task, suggests to me their decision was “reasonably calculated to harm the companies’ respective] reputation[s].” Jefferson Standard, 346 U.S. at 471, 74 S.Ct. 172.
Hedging, the Board retreated to what has become its favorite haven; one the majority has ensured will remain safe. “In any event,” the Board explains, any inaccuracies are excusable since “[t]here is no basis in the record to find that the technicians knowingly and maliciously withheld that information in order to mislead the viewing public.” Mastec, 357 NLRB at 107 (emphasis added). The majority says it “cannot set aside the Board’s findings on this issue as unsupported by substantial evidence.” Op. 43. But there is an obvious reason to 'set aside that finding: it is not in accordance with the law as established by HormeVs explicit rejection of a subjective disloyalty test. The purpose for which these technicians withheld information hardly matters at all. Whether it was to mislead the viewing public, or merely for kicks and giggles, all that matters is *56 whether they knowingly conveyed disparaging information they knew was false. Because they clearly did, I respectfully dissent.
2.
Moreover, I would also conclude the Board erred in concluding the technicians’ repetition of a joking suggestion as though it were serious was not problematic. In training, a MasTec supervisor jokingly suggested the technicians should tell the customers their receiver will blow up if it is not connected to a phone line. Martinez, a former technician, repeated the joke on the newscast as though it were a serious suggestion. The exchange proceeded as follows:
Journalist: Want to avoid a deduction on your paycheck? Well, according to this group, supervisors have ordered them to do or say whatever it takes.
Martinez: Tell the customer whatever you have to tell them. Tell them if these phone lines are not connected the receiver will blow up.
Journalist: You’ve been told to tell customers that ...
Martinez: We’ve been told to say that. Whatever it takes to get that phone line into that receiver.
The specific question before the Board was whether it was maliciously untrue to relay these statements without also revealing they were made in jest. The answer should have been plain enough: omitting the context communicated the false impression that the technicians were, in fact, told to tell an outrageous lie to customers. Because it was obvious to all present that the MasTec supervisor’s suggestion wasn’t serious, Martinez knowingly conveyed false information to the viewing public.
To be sure, while MasTec technicians were not told to mislead customers in this way, they were told to mislead them in another way. They were encouraged to tell customers that the receiver wouldn’t work unless it was connected to the phone line, which was untrue. In the Board’s view, this fact sanitizes the lie Martinez told the viewers of Channel 6. MasTec may not have actually encouraged technicians to warn about receivers blowing up, but because they did encourage them to lie in other ways his statements “underscored that message” and were therefore not maliciously untrue. See Mastec, 357 NLRB at 107.
But just because the technicians were encouraged to mislead customers in one way doesn’t justify Martinez’s false assertion that the technicians were encouraged to mislead customers in this particular way. This “give an inch, take a mile” approach assumes (incorrectly) that the effect of the two statements would have been the same. For obvious reasons, that wouldn’t be so.
From Martinez’s actual assertion, viewers were left with an impression that Mas-Tec and DirecTV are so profit-hungry that they instructed their technicians to tell outrageous, fear-mongering lies. Indeed, to understand that fear mongering was the interview’s purpose we need look no further than the segment’s summation. See Op. 31 (quoting Alyarez (reporting) to say “the attorney general’s office is looking into this newest issue so we’ll, of course, keep you posted”) (emphasis added).
If evidence of subjective intent did have any relevance here, the reporter’s sensationalizing points us to the smoking gun (which the MasTec Board assiduously ignored): the fact that the technicians purposely chose a media forum that focused almost exclusively on consumer fraud. Absent an intention to harm the reputation of the Companies and warn consumers not *57 to do business with them, the Channel 6 program would have no interest in airing this segment. This is exactly what the ALJ — the initial fact finder — concluded, even-when applying the Board’s own “flagrantly disloyal” standard:[10] that employees’. desire to undermine the Companies’ reputation “overshadowed the labor dispute.” See APPX019 (“[Tjhese statements [that the technicians were instructed or encouraged to lie to customers] ... apparently enticed the TV station to even do a story about Respondents’ business.”).
Had Martinez chosen instead to tell the truth, the viewers would still have been presented with a damning picture of these companies, but one far less worthy of outrage. To be sure, deceptive business practices may aggravate consumers. But the more brazen and glaring the deception, the more contempt it earns.
Here again, as with the first set, the truth was all the technicians needed to achieve their goal of currying public sympathy. Choosing instead to hedgé their bets with a few malicious falsehoods, Martinez launched “a sharp, public, disparaging attack upon .. the companies’ ... business policies, in a manner reasonably calculated to harm the company’s reputation and reduce its income.” See Jefferson Standard, 346 U.S. at 471, 74 S.Ct. 172.
3.
More fundamental than my disagreement over what the record demonstrates, I question both the relevance and propriety of the Board’s “maliciously untrue” framework.
Indeed, it is unclear why the Board is concerned with a statement’s malicious falsity at all. Jefferson Standard, the supposed inspiration behind this framework, established an employer’s right to punish employees for “disloyalty” — or, “disparaging attack[s] upon the quality of [their employer’s] product and its business policies, in a manner reasonably calculated to harm the company’s reputation and reduce its income.” 346 U.S. at 471, 74 S.Ct, 172. Determining that a statement is:1 “maliciously untrue” is an unnecessary detour, at least as far as Jefferson Standard is concerned, because we’d still need to decide whether the maliciously untrue statement is sufficiently .disloyal.
The only way to make sense of this framework is to assume the Board treats maliciously false statements as per se disloyal. Otherwise, there is no need for this separate analysis, especially since any time a false statement is something less than malicious — which is typical given how high a bar that is — the Board nonetheless still must examine whether it was “not so disloyal.” But the majority and the Board disclaim a per se approach to determining disloyalty. See, e.g., Op. 39. In sum, the majority’s approach cannot even claim internal logic.
II.
In a future case where we hopefully restore the precedent we gut today, we should require more faithful adherence to the equipoise envisioned by the Court in Jefferson Standard, A proper view of the NLRA, according to the Court, requires proper attention both to the employees’ *58 right to air grievances and the employer’s right to punish disloyalty. Thus, restoring the original spirit of Jefferson Standard requires carefully defining the hallmarks of disloyalty. Fortunately, decisions by various courts of appeals and even the NLRB provide some useful suggestions.
For instance, we have held employee conduct is disloyal when it disparages “the quality of the company’s products and its business policies.” Endicott, 453 F.3d at 536. There, the employee was terminated for commenting publicly that his employer lacked “good ability to manage,” was causing the business to “tank[ ],” and was going to “put it in the dirt,” and we upheld the termination as consistent with Jefferson Standard. Id. at 537. Conversely, where employee conduct did not contain “any remarks or materials disparaging the quality of products of the employer,” we concluded such conduct did not “bring the case within the rationale of [Jefferson Standard].” Allied Indus. Workers, AFL-CIO Local Union No. 289 v. NLRB, 476 F.2d 868, 879 (D.C. Cir. 1973). Thus, where there’s no disparagement of the employer’s product or practices, there’s no cause for termination.[11]
Other courts of appeals, as well as the NLRB, have also examined the following two factors: (1) “whether the appeal to the public concerned primarily working conditions,” and (2) “whether it avoided needlessly tarnishing the company’s image.” NLRB v. Mount Desert Island Hosp., 695 F.2d 634, 640 (1st Cir. 1982); see also Technicolor Gov’t Serv’s, Inc., 276 NLRB 383, 388 (1985) (holding that “disloyalty” turns on whether, in context, “it was necessary to legitimate employee ends”). As public, concerted activity will inherently cause some harm to an employer’s image, this approach suggests that, to avoid acting disloyally, employees must be cautious not to harm the employer’s image more than is necessary or appropriate.
Another possible test for disloyalty finds expression in our en banc decision in Diamond Walnut Growers, Inc. v. NLRB, 113 F.3d 1259 (D.C. Cir. 1997) (en banc). Though technically implicating a different line of Supreme Court precedent (NLRB v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), not Jefferson, Standard), the court’s analysis resonates in both. There, an employee was terminated for participating in a strike and international boycott of his employer’s product. That boycott referred to the employer’s workforce as “‘scabs’ who packaged walnuts contaminated with ‘mold, dirt, oil, worms and debris.’ ” Id. at 1261. And in determining whether the employer had “substantial justification” for terminating the employee, the court considered whether the resolution of the underlying labor dispute would remove the taint brought on by the employee’s conduct. The court concluded:
“The company’s ability to sell the product, even if the strike is subsequently settled, could well be destroyed. If a customer becomes apprehensive to bite into Diamond’s walnuts because of a concern at finding an impurity (even part of a worm), it is unlikely that a *59 strike settlement will eliminate that visceral fear.”
Id. at 1267. Because a strike settlement would not likely reassure prospective buyers that they can safely snack on these walnuts without fear of also chewing into a worm, the employer justifiably terminated the employee.
Each of the foregoing examples suggests that determining disloyalty demands investigation into how the labor dispute and the disloyal activity fit together. Activities focused on working conditions that avoid needlessly tarnishing the company’s image will not be deemed “so disloyal” even if they cause some harm to the employer’s reputation. But when employees get carried away, lose sight of the labor dispute, and cross the Rubicon into disparaging their employers’ products or business practices or inflicting needless or irredeemable damage to their reputation, they forfeit the NLRA’s protection.
In my view, that’s what happened here. The technicians’ disloyalty stems from their statements accusing MasTec and DirecTV of deceptive business practices. These statements display all the hallmark attributes of disloyalty discussed above. As in Endicott, what these technicians alleged constitutes disparagement of the “quality” of the companies’ “business policies.” 453 F.3d at 537. And consistent with Diamond Walnut, it is hard to imagine that a resolution of this labor dispute would remove the distaste local customers (and potential customers) likely have toward these allegedly crooked companies. 113 F.3d at 1268. Finally, unlike in Mount Desert, the false allegations they hurled at MasTec and DirecTV were not “intertwined inextricably with complaints of working conditions,” nor were they “necessary to effectuate employees’ lawful aims.” 695 F.2d at 640-41. To be sure, the employees’ discomfort about lying to customers is certainly related to the labor dispute. Again, had their public complaints actually focused on what MasTec encouraged them to say, there may have been a strong case that these statements were necessary to effectuate their lawful aims. But they said none of these things. Rather, their statements on the broadcast were confined to false allegations that they were required to lie and that they were seriously encouraged to tell customers their receivers would blow up if they didn’t connect a phone line. By falsely suggesting they were required to lie, and to lie so preposterously, they “needlessly tarnish[ed]” MasTec and DirecTV’s image. Consequently, their termination was justified.
As things stand now under this court’s imprimatur, the Board will continue to force employers to endure — and even finance — employees who are “working against [their] business interest,” Hormel, 962 F.2d at 1065, either because the conduct isn’t flagrantly disloyal or the intent behind it isn’t objectively discernible. If I’m ever in Orlando, I half expect I’d see a commercial along these lines:
“Hi, I’m Rob Lowe, and I have DirecTV.”
“And I’m' ‘Channel 6-watching Rob Lowe,’ and well, now I have cable.”
I just hope my receiver doesn’t blow up.

. The Board’s analysis hinges on hedges. See, e.g., Op. 37 (quoting the Board finding “the technicians' conduct was not 'wholly incommensurate with [their] grievances’ ”); id. 42 ("The Board concluded that, ‘for the most part,' the technicians’ statements in the news segment ‘were accurate_' ”); id. (“ ‘Any arguable departures from the truth,’ the Board found, 'were no more than good-faith misstatements....’”); id. (“In fact, the Board agreed that the technicians were not explicitly told to lie; it simply found that they were ‘essentially told to lie.’ ”); id. 43 (‘‘[T]he Board reasonably concluded, ‘the failure to fully explain the 50 percent connection rule was at most an inaccuracy’ ”); id. 45 ("[T]he Board acknowledged that the way the segment described the issue ‘may have been misleading.’ ”) (emphasis added). Do not be misled— the Board's overuse of adverbs and qualifiers is a sign of evasion, not precision. See Stephen King, On Writing 117-22 (2002).

. The majority attempts to cabin Hormel factually too, claiming that its "sole” disloyalty analysis dealt with "post-dispute conduct.” Op. 38. One of the Board’s many hedges describes this characterization — it is not "wholly incommensurate” with the facts, but it is not the full story. Hormel is clear that the post-dispute consumer boycott of Hormel’s products was an "exten[sion]” of labor dispute activity. See 962 F.2d at 1063.

. Among this serial accounting of objective evidence, the ALJ listed one "purely subjective” indication of the employee’s intent. He observed: "[The employee] has testified relat-edly, and I find credibly, that he didn’t believe in the effectiveness of the boycott.” 301 NLRB at 84. However, the Hormel court never cited this; the opinion instead seems to encompass all of the evidence bearing on whether the employee "personally embraced” the boycott.

. Perhaps there is some intent component to acting in furtherance of the boycott. Hormel may not have been able to fire the employee if he was sleepwalking or totally unaware of the purpose óf the event.

. The majority attempts to also relegate Hormel and another of our precedents, Endicott Interconnect Techs., Inc. v. NLRB, 453 F.3d 532 (D.C. Cir. 2006), into the same first prong box it places Jefferson Standard. See Op. 38-40, But it beggars belief to conclude that Hormel and Endicott do not bear upon dis-chargeable disloyalty because the relationship ■ with an ongoing labor dispute was not met. The test contains two prongs that must both be met for the employee to be protected— failing to meet either one means the employee does not enjoy NLRA protection (making the majority’s frequent characterizations of these prongs as "steps” inappropriate). There is no need, therefore, to establish a relationship between the employee's activity and an ongoing labor dispute if disloyalty is proved. In fact, Endicott expressly did not decide the first prong and nevertheless found disloyalty justifying discharge. See 453 F.3d at 537 n.5; id. at 538 (Henderson, J., concurring).

. In fact, this is the first time any circuit court in the country has commented on, let alone accepted, this language. Our previous opinions cite only the Board’s original formulation of the rule, that the conduct is "not so disloyal, reckless, or maliciously untrue as to lose *53 the Act’s protection.” See, e.g., Endicott, 453 F.3d at 537.

. The Court's "plain” and "elemental” descriptors for “the right of discharge” for disloyalty, and its treatment of the right as predating the NLRA, evince that Act’s harmony with the longstanding common law duty of loyalty from which the right to discharge for disloyalty follows. Our insistence in Hormel on “an objective test of disloyalty” under the NLRA confirms the same. See 962 F.2d at 1065 (citing The Common Law to say that ”[a]cts should be judged by their tendency under the known circumstances, not by the actual intent which accompanies them") (emphasis added).

. ■ To be sure, the Court didn’t explain why the particular means used by these employees deprived them of the Act’s protection. But that does not mean we must infer their means were therefore “flagrant.” The Board’s prior statement of the disloyalty analysis, as we approved in Endicott, strikes me as 'quite reasonable. See 453 F.3d at 537 (approving that the concerted activity be “not so disloyal ... as to lose the Act’s protection”) (emphasis added). There seems to be a significant difference between "flagrant” disloyalty and conduct that is "so” disloyal it is unprotected. The majority concludes otherwise, equating them as "various formulations.” See Op. 37 But if that is true, and "flagrant” disloyalty is thus a requirement stemming from Jefferson Standard, then the majority should explain, for example, how, in light of today’s decision, an employee's failure to make obliged deliveries to avoid crossing a picket line constitutes “flagrant” disloyalty. See Jefferson Standard, 346 U.S. at 478 n.13, 74 S.Ct. 172.

. For what it’s worth, I find no support in the NLRB’s decision for that statement. Prior to Mastec, the Board had never “stated that it will not find a public statement unprotected unless” it is "flagrantly disloyal” and “wholly incommensurate.” The decision it cites for this proposition, Five Star Transportation, Inc., stated only that it will consider whether "the attitude of the employees is flagrantly disloyal [and] wholly incommensurate....” 349 NLRB 42, 45 (2007). Not a single NLRB decision characterizes the "flagrantly disloyal”/"wholly incommensurate” language in the conditional language employed in Mastec. The Board’s statement that it had stated the rule in conditional terms is incorrect.

. The majority repeatedly notes the Companies do not challenge the Board’s standard. See, e.g., Op. 32-33, 34-35, 37, 41-42. Why should they? Applying Hormel’s objective standard, the ALJ found for the Companies even under the Board’s stringent standard. Perhaps the majority is suggesting any judicial questioning of the Board’s standard is beyond the pale. I hope not. Judicial review should mean moré than batting cleanup for the administrative state.

. An important note: nearly every public, concerted activity by employees or unions will cause some harm to employers, but that “does not alone render them disloyal.” Mohave Elec. Coop., Inc. v. NLRB, 206 F.3d 1183, 1189 (D.C. Cir. 2000); see also Five Star Transp., Inc. v. NLRB, 522 F.3d 46, 53-54 (1st Cir. 2008) ("Indeed, were harm or potential harm to the employer to be the determining factor in the Court’s [] protection analysis, it is doubtful that the legislative purposes of the Act would ever be realized.”). What matters, it seems, is disparagement of the employer’s products or business practices, not its labor practices.